[No. A126865. First Dist., Div. Five. June 6, 2011.]

PATRICK C. KELLEY, Plaintiff and Appellant, v.
THE CONCO COMPANIES et al., Defendants and Respondents.

**COUNSEL**

Law Offices of John T. Schreiber and John T. Schreiber for Plaintiff and Appellant.

Fitzgerald Abbott & Beardsley and Michael E. Caples for Defendants and Respondents.

**OPINION**

**BRUINIERS, J.**—Patrick C. Kelley was an apprentice ironworker employed by respondent The Conco Companies (Conco). He complained that he was subjected to a barrage of sexually demeaning comments and gestures by his male supervisor, and later to similar comments by male coworkers, and that he was also subjected to physical threats by coworkers in retaliation for his complaints about his supervisor. Kelley's employer changed his worksite to separate him from his harassers, but Kelley was later suspended by his union from its apprenticeship program, rendering him ineligible for employment.

After the suspension expired, he was not rehired by Conco. He filed suit against Conco and his former supervisor, and the trial court granted defendants' motion for summary judgment on Kelley's claims for sexual harassment, retaliation and related causes of action. We reverse as to Kelley's retaliation claim under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.),[1] and otherwise affirm.

## I. BACKGROUND

In October 2007, Kelley sued Conco and David Seaman (collectively, Defendants) for sex discrimination and sexual harassment in violation of FEHA (§ 12940); retaliation; termination in violation of public policy; failure to prevent discrimination; intentional infliction of emotional distress; and negligent infliction of emotional distress. Defendants moved for summary judgment. We summarize the evidence offered in support of and opposition to summary judgment, construing Kelley's evidence liberally and Defendants' evidence narrowly and drawing, as we must, all reasonable inferences in favor of Kelley. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 254 [100 Cal.Rptr.3d 296].)

*The Emeryville Jobsite Incidents*

Conco is one of the largest concrete construction companies in California. Kelley was an apprentice ironworker with Ironworkers Union Local 378 (Local 378) and Conco was a union shop. To get work, Kelley would contact companies such as Conco directly and, once hired, he would inform the union and obtain a dispatch slip.

On July 28, 2006, Kelley was hired as an apprentice ironworker at Conco and began working at a jobsite in Emeryville with Seaman as his supervisor. On about July 30, 2006,[2] Seaman told Kelley to move some rebar and not to

---

[1] All statutory references are to the Government Code unless otherwise indicated.

[2] The record is unclear about which dates and for how many days Kelley worked on the Emeryville job. Kelley testified that he worked two days at Emeryville and that the main incident with Seaman occurred on the second day. He also testified that he drove himself back and forth from work each day he worked at Emeryville. Seaman testified that Kelley worked at Emeryville four days and that the main incident occurred on Kelley's fourth workday. Seaman also testified that he drove Kelley back and forth from work on two of Kelley's four workdays at Emeryville. In his response to Defendants' statement of undisputed material facts, Kelley did not dispute that he worked at Emeryville for four days, despite his contradictory testimony. However, Robyn Read, a Conco human resources assistant responsible for maintaining the company's personnel records, averred that Kelley was hired on July 28, 2006, and Gallegos averred that he spoke to Seaman and Kelley at the Emeryville jobsite on July 30, 2006. Both Seaman and Kelley stated that Gallegos spoke to them at the jobsite on the same day as the incident between Seaman and Kelley.

mix up the pieces of different lengths. As Kelley moved the rebar, it did get mixed up and Kelley tried to sort the piles using his foot. Seaman yelled at Kelley to "fucking quit using [your] goddamn fucking foot; bend the fuck over and pick that shit up. Pick that shit up, bitch." After Kelley completed that task, Seaman told him to tie some other rebar. While Kelley was bent over, Seaman came up behind him and called him a "bitch" and a "fucking punk." He said Kelley had a "nice ass," he wanted to "fuck [Kelley] in the ass," Kelley's pants "made [his] ass look good," Kelley would "look good in little girl's clothes;" he would "fuck the shit out of [Kelley's] ass," he would "fuck [Kelley] better than [Kelley's] old lady," he would make Kelley "his bitch," he would "cum all over [Kelley's] ass" and he would "turn [Kelley] out." After Kelley finished tying the rebar, Seaman told him to get down and screw metal plates to the wall. When Kelley got on his knees to complete the task, Seaman said, "That's where you belong[,] on your knees." Kelley said that a coworker, who he identified only as a Hispanic male from Sacramento, "got in my face" and said he was going to "make me suck [Seaman's] dick" while he watched. Seaman said he thought the comment was a joke and thought it was funny.

Kelley confronted Seaman and said Seaman was "fucking gay." Seaman responded angrily and "puffed up," took off his tool bag and said he was going to "kick [Kelley's] ass."[3] Seaman told Kelley to get off the job. Kelley began walking off the job, but a coworker told him not to leave because he would be fired.

Kelley remained on the job, ate lunch on the jobsite and did not interact with anyone. After lunch, Kelley spoke to Conco field safety manager Joseph Anthony Gallegos, Jr., for 20 to 30 minutes and told him "exactly what happened."[4] While talking about Seaman, Kelley became emotional, started crying and had to turn his head away. Gallegos told Kelley to keep working and he would talk to Seaman and the person in charge of the whole job and try to get Kelley off the job. After speaking to Seaman, Gallegos told Kelley, " 'Sorry, dude, there's nothing I can do. Stay on the job. If you leave you'll get fired.' "

---

[3] Seaman knew that fighting would be a basis for termination for both him and Kelley.

[4] The parties dispute how the matter came to Gallegos's attention. Kelley testified that a coworker had expressed concern to Kelley about the incident and Kelley saw that coworker talk to Gallegos before Gallegos spoke to Kelley. Gallegos and Seaman testified and averred that Seaman asked Gallegos to come to the jobsite so he could observe Kelley's slow and inefficient job performance. Gallegos said he spoke to Seaman both before and after he talked to Kelley, but Seaman testified at his deposition that he spoke to Gallegos only after Kelley had already spoken to him.

Gallegos asked Seaman " 'What the fuck you doing, Dave? Fuckin' talking like that to that kid?' " and Seaman responded, " 'Fuck, I don't know. I don't know why I said that.' " Gallegos told Seaman to calm down and apologize to Kelley. Gallegos and Seaman said that Seaman and Kelley shook hands and that Seaman apologized. Kelley agreed that he and Seaman shook hands, but denied that there was an apology.

On the afternoon of the Seaman incident, two coworkers called Kelley a "bitch" and one "got in [Kelley's] face" and "talk[ed] shit" to him. Seaman twice told them to leave Kelley alone, but Kelley heard them continue to say they were going to jump him after work. When Kelley got home, he called the Conco dispatcher, Scott Nava, asked to be assigned to a different jobsite, and explained why. Nava agreed and told him to report the next day to a Vallejo worksite.

*Kelley's Work in Vallejo and Redwood City*

After leaving the Emeryville jobsite, Kelley worked on a Conco job in Vallejo for two days. On both days coworkers called him a "bitch," "faggot," and "narc" or "snitch" for complaining and two of them told him he would be lucky if he did not get his ass beat after work. A supervisor was within earshot but ignored the comments. Kelley reported the incident to Nava at the end of the day and Nava said, " 'Well, that's the way the trade is, man. That's just the way these guys are.' "

A week or two after the Emeryville job, Seaman called Kelley and asked if he wanted a ride to a Conco job in Redwood City. Kelley accepted the ride because he was afraid he would lose his job if he declined. Seaman was not Kelley's supervisor on that job, and Kelley worked there for three or four days without incident. According to Seaman, Kelley's job performance was better in Redwood City than in Emeryville.

*Kelley's Other Work for Conco*

Kelley never worked with Seaman again, but he worked for Conco on other jobs over the next three months. On some jobs, he had no problems. At others, he heard remarks daily about what had happened with Seaman. He was called "punk bitch," "snitch" or "fag," and people would "get in his face" and would threaten to jump him after work. Kelley complained about this conduct to Scott Nava "two [to] three times a week" and asked to be removed from the jobs. Nava regularly moved him. Kelley also complained to at least one other person ("Tony") at Conco on two or three occasions about the behavior.

*Kelley's Suspension from the Union*

Kelley was required to attend classes in order to maintain his status as a union apprentice. He wrote the union a letter asking for a day off so he could attend his brother's wedding and handed it to union representative Dana Fairchild before a class. After Kelley took the day off (which was after the incident with Seaman), Fairchild told Kelley he never received the letter and the absence was unauthorized. Fairchild raised the issue with the apprenticeship board and on October 3, 2006, Kelley was asked to leave a Conco job to attend a board meeting on the issue. At the meeting, the board suspended him for six months.[5]

The apprenticeship board notified Conco on October 10, 2006, that Kelley had been dropped from the program effective October 3 and was not eligible for employment or training under the terms of the union's collective bargaining agreement with Conco. Kelley never again worked at Conco.

*Kelley's Subsequent Search for Work*

After the suspension expired in about April 2007, the union told Kelley never to call or go back to Conco because there was no longer any kind of work for him there. When Kelley later tried to get work from other companies, he would be released after the first week of pay. When he asked the union why he was getting released, Fairchild "got on his case," "yelled at him for what happened at Conco," and said that was the reason he could not get work.

Kelley worked for short durations for other contractors including Brodhead Steel, Mission City Steel, Harris Salinas, and Shepard Steel. While working at Brodhead, Kelley's coworkers called him a "bitch" and a "narc" and one coworker who said he was a friend of Seaman's told Kelley he was a "punk for doing what [he] did." There were three incidents at Brodhead involving two workers. Kelley was fired from the Harris Salinas job because he tested positive for marijuana. The company told him to check back for work in a few months, but he was never rehired. Kelley's boss at Shepard said he wanted to keep Kelley, saying Kelley was a good worker, but told Kelley "the guys upstairs" did not think he was going to work out so he was let go.

*Kelley's Resignation from the Union*

Kelley said that by October 2007, he was suffering a deep depression and did not want to go back to ironworking. He asked the union for a six-month

---

[5] Fairchild later told Kelley he found the letter. The suspension was not reversed, however.

leave of absence from the apprenticeship program "[d]ue to the unlawful harassment and discrimination I endured while employed by Conco Companies." The union granted the request on November 26, 2007. Before that six-month leave of absence expired, Kelley resigned from the union. Once he resigned from the union, he could no longer work on union ironworker jobs. After his resignation, he was unable to find work as an ironworker and he was unemployed or employed in low-paying jobs.

*Trial Court Rulings*

At the hearing on the summary judgment motion, the court summarized its understanding of the evidence as follows. "[D]istilling as best I can[,] . . . all of a sudden, on one day, [Seaman] goes ballistic and gets so mad at Mr. Kelley that he lets loose with a great volume of extremely-unpleasant, ugly, sexually-ladened language and that that provokes something of a confrontation, in which [Kelley] challenges [Seaman] and the two of them square off, but, for some reason, no physical altercation ensues. And then, you know, things kind of go back to being more or less normal. [¶] . . . There doesn't appear to be any kind of a pervasive nature of this conduct[.] [¶] The question in my mind is, is the incident in and of itself so severe, . . . so inherently destructive of [Kelley's] work environment that in and of itself it should be considered sexual harassment? . . . [T]hat's really the only question I have." After hearing argument, the court took the matter under submission and subsequently issued a written order granting summary judgment to Defendants.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fns. omitted (*Aguilar*).) When the plaintiff bears the burden of proving facts by a preponderance of

the evidence and the defendant moves for summary judgment, the defendant "must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not . . . ." (*Id.* at p. 851.)

An order granting summary judgment is reviewed de novo. (*Aguilar, supra,* 25 Cal.4th at p. 860.) In ruling on the motion, the court must draw all reasonable inferences from the evidence in the light most favorable to the opposing party. (*Id.* at p. 843.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123] (*Yanowitz*).)

B. *Sexual Harassment and Sex Discrimination Cause of Action*

■  FEHA's " 'prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex.' [Citation.]" (*Lyle v. Warner Brothers Televison Productions* (2006) 38 Cal.4th 264, 277 [42 Cal.Rptr.3d 2, 132 P.3d 211] (*Lyle*).)[6] Claims of a hostile or abusive working environment due to sexual harassment arise when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult . . .' [citation], that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . .' [citation] . . . ." (*Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [126 L.Ed.2d 295, 114 S.Ct. 367].)[7]

"The elements of such a cause of action are: '(1) plaintiff belongs to a protected group; (2) plaintiff was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment

---

[6] As noted, Kelley's first cause of action is based on both section 12940, subdivision (a)'s prohibition against discrimination because of sex and section 12940, subdivision (j)(1)'s prohibition against harassment because of sex. These are distinct causes of action that require different showings by plaintiff. (See *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 705–706 [101 Cal.Rptr.3d 773, 219 P.3d 749].) However, Kelley's sole argument on appeal with respect to the first cause of action is that he was harassed. Therefore, we limit our discussion to that claim. (See *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460, fn. 5 [30 Cal.Rptr.3d 797, 115 P.3d 77] (*Miller*).)

[7] "Because FEHA is considered a counterpart of the federal antidiscrimination statute (42 U.S.C. § 2000e et seq.), federal decisions construing the latter may be relied on when interpreting FEHA. [Citation.]" (*Dominguez v. Washington Mutual Bank* (2008) 168 Cal.App.4th 714, 722, fn. 8 [85 Cal.Rptr.3d 705]; see also *Lyle, supra,* 38 Cal.4th at p. 279 [for hostile work environment claims, Cal. courts apply standards developed under title VII of the Civil Rights Act of 1964 (title VII; 42 U.S.C. § 2000e et seq.)].)

complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment; and (5) respondeat superior.' [Citation.]" (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377 [62 Cal.Rptr.3d 200].)

Kelley argues the trial court erred both in ruling that the evidence did not support an inference that he was harassed because of his sex, and in ruling that the harassment was not severe or pervasive enough to amount to an adverse employment action actionable under FEHA.

### 1. *Discrimination Based on Sex*

■ The sine qua non of any sexual harassment claim is that the plaintiff suffered discrimination because of sex. (*Lyle, supra,* 38 Cal.4th at pp. 279–280; *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81 [140 L.Ed.2d 201, 118 S.Ct. 998] (*Oncale*).) " ' "[T]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." ' [Citation.]" (*Lyle,* at pp. 279–280, quoting *Oncale,* at p. 80.) A FEHA plaintiff must show " ' "that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.' " [Citation.]' [Citations.] Accordingly, it is the disparate treatment of an employee on the basis of sex . . . that is the essence of a sexual harassment claim." (*Lyle,* at p. 280.) Because proof of discriminatory intent often depends on inferences rather than on direct evidence, very little evidence of such intent is necessary to defeat summary judgment. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1386 [96 Cal.Rptr.2d 236]; *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1751 [52 Cal.Rptr.2d 620].)

■ In *Oncale,* the United States Supreme Court held that sexual harassment within the meaning of title VII could occur between members of the same sex as long as the plaintiff could establish that the harassment amounted to discrimination *because of sex.* (*Oncale, supra,* 523 U.S. at pp. 79–80.) We have no difficulty concluding that the same rule applies to FEHA actions, as our sister courts have held both before and after *Oncale* was decided. (*Mogilefsky v. Superior Court* (1993) 20 Cal.App.4th 1409, 1416–1418 [26 Cal.Rptr.2d 116] (*Mogilefsky*); *Sheffield v. Los Angeles County Dept. of Social Services* (2003) 109 Cal.App.4th 153, 160 [134 Cal.Rptr.2d 492]; *Singleton v. United States Gypsum Co.* (2006) 140 Cal.App.4th 1547, 1557 [45 Cal.Rptr.3d 597] (*Singleton*); but see *Hart v. National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1426 [235 Cal.Rptr. 68] [without analysis, concluding that same-sex sexual harassment claim failed because plaintiff did not show harassment because of his sex].)

■ The difficulty arises in determining when same-sex harassment amounts to discrimination *because of sex.* In *Oncale,* the Court observed that an inference of sex-based discrimination is often "easy to draw in most male-female sexual harassment situations" that involve proposals of sexual activity, but may not be so readily drawn in a same-sex context. (*Oncale, supra,* 523 U.S. at p. 80.) The court clearly stated that the mere fact that harassment has sexual content is insufficient to establish that it constituted discrimination because of sex. (*Id.* at p. 80.) As noted, *Oncale* observes, "Title VII does not prohibit all verbal or physical harassment in the work-place; it is directed only at '*discriminat*[*ion*] . . . because of . . . sex.' We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' [Citation.]" (*Oncale, supra,* 523 U.S. at p. 80.) Similarly, the California Supreme Court has held that "it is the disparate treatment of an employee on the basis of sex—not the mere discussion of sex or use of vulgar language—that is the essence of a sexual harassment claim." (*Lyle, supra,* 38 Cal.4th at p. 280.) Both courts have cautioned that title VII and FEHA should not be transformed into "a general civility code for the American workplace." (*Oncale,* at p. 80; see *Lyle,* at p. 295.)

*Oncale* suggests alternative "evidentiary route[s]" that could support an inference that same-sex harassment was discrimination because of sex. (*Oncale, supra,* 523 U.S. at pp. 80–81.) An inference of discrimination may be "easy to draw" in male-female sexual harassment situations where there are explicit or implicit proposals of sexual activity, and "[t]he same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual." (*Id.* at p. 80.) An inference of discrimination on the basis of sex could be drawn where, for example, "a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser was motivated by general hostility to the presence of women in the workplace. A same-sex harassment plaintiff [might] also . . . offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." (*Id.* at pp. 80–81.)

While we agree with Kelley's assertion that these are not necessarily the *exclusive* means of establishing that inference, "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.' " (*Oncale, supra,* 523 U.S. at p. 81.)

We note first our agreement with the trial court's assessment that the relevant incident for consideration of this issue is that which occurred in Emeryville on or about July 30, 2006.[8] Unquestionably, the language used by both Seaman and by one of Kelley's coworkers on July 30 was graphic, vulgar, and sexually explicit. The literal statements expressed sexual interest and solicited sexual activity. There was, however, no "credible evidence that the harasser was homosexual" or that the harassment was "motivated by sexual desire." (See *Oncale, supra*, 523 U.S. at p. 80.) Kelley makes no contention here that Seaman's statements were intended to be taken literally. Instead, it appears undisputed that in the environment in which this incident took place, sexually taunting comments by supervisors and employees were commonplace, including gay innuendo, profanity, and rude, crude and insulting behavior. Such comments were made both jokingly and in anger.

The statements made to Kelley were crude, offensive and demeaning, as it was evident that they were intended to be. No evidence, however, was presented from which a reasonable trier of fact could conclude that they were an expression of actual sexual desire or intent by Seaman, or that they resulted from Kelley's actual or perceived sexual orientation. The mere fact that words may have sexual content or connotations, or discuss sex, is not sufficient to establish sexual harassment. (*Lyle, supra*, 38 Cal.4th at pp. 279–280.) "[W]hile the use of vulgar or sexually disparaging language may be relevant to show discrimination, it is not necessarily sufficient, by itself, to establish actionable conduct." (*Id.* at p. 281.)

Courts have routinely insisted on evidence that an alleged harasser was acting from genuine sexual interest before holding that the fact of a sexual proposition supported an inference of discrimination because of sex. (*Davis v. Coastal Internat. Security, Inc.* (D.C. Cir. 2002) 348 U.S. App.D.C. 375 [275 F.3d 1119, 1121, 1125] [where alleged harassers grabbed plaintiff's crotch, made kissing gestures and described oral sex, court distinguished cases involving "actual homosexual desire [that] motivated the harassment"]; *McCown v. St. John's Health System* (8th Cir. 2003) 349 F.3d 540, 541–543 [where alleged harasser grabbed plaintiff's genitalia and simulated anal intercourse with plaintiff, evidence of sexual harassment was insufficient because there was "no evidence . . . that [the harasser] was homosexual and

---

[8] The threatening comments Kelley says were made by two coworkers later in the day on July 30 were apparently related to an argument about cigarettes, rather than to any altercation between Kelley and Seaman. As we discuss *post*, although Kelley points to continuing verbal harassment by coworkers "talking shit" to him at other jobsites at later dates, those statements expressed apparent anger at Kelley and hostility for being a perceived "snitch" and "narc" for complaining about Seaman. Kelley quotes coworkers on other dates as referring to him as a "bitch." "[T]he term 'bitch' is not so sex-specific and derogatory that its mere use necessarily constitutes harassment because of sex." (*Lyle, supra*, 38 Cal.4th at p. 282.) He also alleges that unidentified coworkers also called him a "fag."

motivated by sexual desire"]; *Pedroza v. Cintas Corp. No. 2* (8th Cir. 2005) 397 F.3d 1063, 1069 [where alleged harasser attempted to kiss plaintiff on mouth and implied she wanted plaintiff sexually, evidence was insufficient that harassment was motivated by sexual desire]; see also *La Day v. Catalyst Technology, Inc.* (5th Cir. 2002) 302 F.3d 474, 480 [explaining genuine sexual desire can be established by evidence that harasser intended to have sexual contact with plaintiff rather than merely humiliate plaintiff or that harasser made same-sex sexual advances to others]; *Dick v. Phone Directories Co., Inc.* (10th Cir. 2005) 397 F.3d 1256, 1264–1265 [plaintiff must show harasser acted out of genuine sexual desire, but need not show harasser was homosexual].)

Kelley cites *Singleton, supra,* 140 Cal.App.4th 1547 in support of his argument that he was not required to show any sexual intent or motivation to establish his claim. In *Singleton,* our colleagues in the Second District held that same-sex harassment, very similar to the conduct alleged here, was gender specific and thus constituted discrimination because of sex. (*Id.* at pp. 1561–1562.) In *Singleton,* male coworkers made homophobic comments to the male heterosexual plaintiff, repeatedly called him " 'Sing-a-ling,' " which the plaintiff understood as a reference to a homosexual movie character, told the plaintiff he was wearing tight jeans or a G-string, made gestures and comments suggesting the plaintiff performed fellatio on his supervisor, threatened to anally penetrate the plaintiff, and solicited oral sex from the plaintiff. (*Id.* at pp. 1552–1553.)

The *Singleton* court found evidence that Singleton was disparately treated because of his sex because the statements "targeted Singleton's heterosexual identity, and attacked it by and through their comments" thereby treating him " 'differently' " than they would have treated a woman. (*Singleton, supra,* 140 Cal.App.4th at p. 1562.) "It follows that the harassment was 'because of sex,' i.e., it employed attacks on Singleton's identity as a heterosexual male as a tool of harassment." (*Ibid.*; see also *Miner v. Mid-America Door Co.* (2002) 2003 OK CIV APP 32 [68 P.3d 212, 219] [harassing comments "clearly were intended to attack Plaintiffs' masculinity [and] question their virility" but there was also evidence that women were not treated in the same manner].)

We respectfully disagree. *Singleton* finds that the gender-specific nature of the harassment establishes disparate treatment based on sex. *Singleton*'s reasoning inevitably leads to the conclusion that any hostile, offensive and harassing comment or conduct, with or without sexual content or innuendo, made to one gender and which would not be made to the other, would constitute discrimination because of sex within the scope of FEHA. (*Singleton,*

*supra,* 140 Cal.App.4th at pp. 1562, 1564.) What matters, however, is not whether the two sexes are treated *differently* in the workplace, but whether one of the sex is treated *adversely* to the other sex in the workplace because of their sex. (*Oncale, supra,* 523 U.S. at p. 80; *Lyle, supra,* 38 Cal.4th at pp. 279–280.)

While Kelley was undoubtedly subjected to grossly offensive comments and conduct, he did not produce evidence which would support a claim that he suffered discrimination in the workplace because of his gender.

### 2. *Severe and Pervasive Harassment*

Since we find that Kelley failed to meet his burden of establishing sex-based discrimination, we need not address the trial court finding that he also failed to establish that the conduct was " 'sufficiently severe or pervasive to alter the conditions' of the victim's employment and create an abusive working environment.' " (*Harris v. Forklift Systems, Inc., supra,* 510 U.S. at p. 21.) We observe, however, that although Kelley alleges conduct by Seaman that was patently offensive, the evidence Kelley presented failed to show pervasive hostile conduct, sexually motivated or otherwise, by Seaman or by any other supervisor on any date other than July 30, 2006.[9] He concedes that he had no issues or difficulties with Seaman after that date. Kelley admitted that, after management intervention by Gallegos, Seaman ceased any personal harassment of Kelley on the very same day. After Gallegos talked to both Kelley and Seaman, Seaman left Kelley alone and Seaman even intervened when he overheard Kelley's coworkers make other harassing comments to Kelley. When Kelley subsequently rode with Seaman and worked with him at a Redwood City jobsite, he experienced no further harassment. Kelley offers evidence of workplace hostility and aggressive and threatening comments by coworkers on that date and thereafter, but makes no showing of any *sexually discriminatory* animus for that behavior. When Kelley complained about that harassment, he acknowledges that Conco moved him to different jobsites at his request to separate him from the harassers.

■ "[T]o establish liability in a FEHA hostile work environment sexual harassment case, a plaintiff employee must show [he] was subjected to sexual advances, conduct, or comments that were *severe enough or sufficiently pervasive to alter the conditions of [his] employment and create a hostile or abusive work environment.* [Citations.]" (*Lyle, supra,* 38 Cal.4th at p. 283; see *Miller, supra,* 36 Cal.4th at p. 462.)

---

[9] None of Kelley's managers or supervisors was trained on sexual harassment or discrimination until after Kelley filed his lawsuit. All agreed, based on their postlawsuit training, that Seaman's and other employees' sexual comments violated company policy.

"With respect to the pervasiveness of harassment, courts have held an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature. [Citations.]" (*Lyle, supra,* 38 Cal.4th at pp. 283–284; see *Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 150–153 [124 Cal.Rptr.2d 1] [liability for sexual harassment may not be imposed based on a single incident that does not involve egregious conduct akin to a physical assault or the threat thereof]; accord, *Smith v. Northwest Financial Acceptance, Inc.* (10th Cir. 1997) 129 F.3d 1408, 1414 ["isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct"].)

We believe the trial court correctly determined that Kelley failed to establish that he was subjected to a sexually discriminatory environment that altered the conditions of his employment. We affirm the trial court's summary adjudication of the sexual harassment claim in favor of Defendants.

## C.   *Failure to Prevent Sexual Harassment*

█   The trial court granted summary adjudication to Conco on Kelley's claim for failure to prevent sexual harassment because Kelley "failed to show that he was subjected to unlawful sexual harassment while employed by Conco. *See Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925, fn. 4 [44 Cal.Rptr.3d 223, 135 P.3d 637] ('But courts have required a finding of actual discrimination or harassment under FEHA before a plaintiff may prevail under section 12940, subdivision (k)')." We affirm on the same ground.

## D.   *Retaliation*

The trial court granted summary adjudication of Kelley's claim for retaliation under section 12940, subdivision (h) because Kelley "failed to present sufficient evidence to create a triable issue of material fact regarding the contention that he was subjected to an adverse employment action by Defendants because he complained about Seaman's misconduct to Joseph Gallegos and/or other managers of Conco. [Kelley] has completely failed to show that Conco's assertion that it had no choice but to terminate [his] employment on or about November 8, 2006, because he was dropped from the ironworkers apprenticeship program was pretextual. [Kelley's] contention that Conco now refuses to hire him after he was reinstated to the apprenticeship program because he has been blacklisted is not supported by any admissible evidence."

### 1. *Legal Standards*

■ It is an unlawful employment practice for an employer to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . ." (§ 12940, subd. (h) (section 12940(h)).) "[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz, supra,* 36 Cal.4th at p. 1042.)

### 2. *Protected Activity*

■ "It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA. [Citations.] [¶] Strong policy considerations support this rule. Employees often are legally unsophisticated and will not be in a position to make an informed judgment as to whether a particular practice or conduct *actually* violates the governing antidiscrimination statute. A rule that permits an employer to retaliate against an employee with impunity whenever the employee's reasonable belief turns out to be incorrect would significantly deter employees from opposing conduct they believe to be discriminatory. [Citations.]" (*Yanowitz, supra,* 36 Cal.4th at p. 1043, fn. omitted.)

Moreover, a mistake of either fact or law may establish an employee's good faith but mistaken belief that he or she is opposing conduct prohibited by FEHA. (*Miller, supra,* 36 Cal.4th at p. 475.) As an illustration of a case where an employee's good faith but erroneous belief that he or she was protesting prohibited conduct, *Miller* cites *Drinkwater v. Union Carbide Corp.* (3d Cir. 1990) 904 F.2d 853. (*Miller,* at p. 475.) In *Drinkwater,* the court held that the plaintiff's reliance on case law that was later overruled established her reasonable and good faith belief that the conduct she protested was a violation of antidiscrimination law. (*Drinkwater,* at pp. 865–866.) In this case, at the time Seaman harassed Kelley, two California Courts of Appeal had

concluded that same-sex harassment that consisted of sexual comments designed to humiliate the plaintiff and challenge his gender identity constituted harassment because of sex within the meaning of FEHA. (*Mogilefsky, supra*, 20 Cal.App.4th at pp. 1412, 1415–1416; *Singleton, supra*, 140 Cal.App.4th at pp. 1561–1562, 1564.) Therefore, Kelley reasonably could have believed that the harassment he experienced at Conco violated section 12940, subdivision (j)(1). Kelley also could have reasonably believed that the harassment he experienced was sufficiently severe or pervasive to amount to an actionable hostile work environment. As we observed *ante*, we find that Kelley failed to produce sufficient evidence to make that showing. Kelley's belief, however, that it did amount to actionable harassment was reasonable.

We conclude Kelley has produced sufficient evidence to support an inference that he engaged in protected activity within the meaning of FEHA when he complained of Seaman's conduct.[10]

### 3. *Adverse Employment Action and Causal Link*

Section 12940(h) provides that it is an unlawful employment practice for an employer "to discharge, expel, or otherwise discriminate against any person" because the person opposed prohibited conduct. The term "otherwise discriminate" refers to and encompasses the same forms of adverse employment activity that are actionable under section 12940, subdivision (a)'s prohibition against discrimination because of sex. (*Yanowitz, supra*, 36 Cal.4th at pp. 1050–1051.) Creation or tolerance of a hostile work environment for an employee in retaliation for the employee's complaining about prohibited conduct is an adverse employment action within the meaning of section 12940(h). (*Yanowitz*, at pp. 1052–1053.) Moreover, an employer's alleged retaliatory responses may be considered collectively to determine whether the employee was subjected to an adverse employment action under section 12940(h). (*Yanowitz*, at pp. 1055–1056.)

Kelley argues that his termination from Conco upon his suspension from the union and Conco's failure to rehire him following his suspension were adverse employment actions taken in retaliation for his complaints about

---

[10] But see *Hamm v. Weyauwega Milk Products, Inc.* (7th Cir. 2003) 332 F.3d 1058, 1059, 1065–1066 (because the alleged same-sex harassment in an all-male workplace did not amount to discrimination because of sex, plaintiff's complaints about the conduct did not concern an employment practice that violated tit. VII); *Spearman v. Ford Motor Co.* (7th Cir. 2000) 231 F.3d 1080, 1085, 1086, footnote 5 (because harassment based on plaintiff's sexual orientation did not amount to discrimination because of sex, plaintiff's complaints about the harassment did not concern an employment practice that violated tit. VII).

Seaman's harassment.[11] He also complains of ongoing harassment at Conco jobs between the Seaman incident and his termination from the company. Although we concluded *ante* that these incidents did not create a hostile working environment for Kelley on the basis of sex, we consider here whether they amounted to a hostile working environment in retaliation for Kelley's complaints or otherwise contributed to an adverse employment action in retaliation for Kelley's complaints.

### a. *The Union Suspension*

Kelley produced evidence that union representative Fairchild fabricated reasons for Kelley's suspension from the union in October 2006. However, Kelley fails to present any evidence that would support an inference that *Conco* caused his union to suspend him from its apprenticeship program. Kelley cites only Fairchild's hostile comments about Kelley's complaints about Conco, and Jeffrey Thomas's admission that he spoke to the union about Kelley's suspension. He also notes that Thomas was a longtime union member. But Thomas was the superintendent of the Conco ironworkers, Fairchild was the apprentice coordinator for the union, and Kelley was the only Conco employee on the union list of dropped apprentices. It was Thomas's responsibility to then let the job foreman know that an apprentice was ineligible to work. Kelley makes no showing that any communication between Thomas and Fairchild on his union status was unusual or suspicious, and offers nothing more than speculation that the union's action was at Conco's behest. Whatever Fairchild's motivation, nothing Kelley presented would support an inference of collusion or management involvement in the union suspension.

Kelley raises no triable issue about whether Conco caused the union to suspend him in retaliation for Kelley's complaints about harassment, and he acknowledges that he was ineligible for continued employment after that suspension. He therefore fails to show that Conco's basis for terminating him was pretextual.

### b. *Failure to Rehire*

Kelley also argues that Conco's failure to rehire him after the expiration of his suspension was in retaliation for his complaints about sexual harassment.[12] However, Kelley implicitly concedes in his reply brief that, although

---

[11] In the trial court, Kelley argued that Conco caused him to be blacklisted in the ironworker industry following the expiration of his union suspension, but he does not reassert this claim on appeal.

[12] Section 12940(h) affords employees who engage in protected activities protection the same range of protection from adverse employment actions that are prohibited by section 12940,

he worked for other employers following his reinstatement, he never again *sought* work with Conco. He explains that he did not seek additional work at Conco because Fairchild told him that he would not get work because of his conflict with Seaman. Kelley implies that he understood Fairchild's comment as an indication that Conco would not hire him if he reapplied for employment. Fairchild, however, was not a Conco employee or agent and Kelley produces no evidence that it would in fact have been futile to reapply for employment with Conco. He cannot show that Conco discriminated against him by failing to hire him for a job for which he did not apply.

### c. *Retaliatory Harassment*

Kelley's final claim of retaliation is for continuing harassment at Conco worksites following his complaint about Seaman's harassment, including express references to Kelley's complaints about Seaman and threats of retaliatory violence. Kelley's evidence established a clear inference that he was subjected to retaliation by at least some of his coworkers as a result of his complaints against Seaman. Not only did the threatening statements allude to Kelley's prior complaint, but as Mark Benedet, Conco's superintendent of carpenters and Seaman's supervisor at the Emeryville jobsite testified, in the construction trades news of altercations between a supervisor and an employee passes "around the whole community." In fact, Kelley alleged that he heard similar comments, and received similar threats, from coworkers on other non-Conco jobsites on three occasions.

■ Mere ostracism in the workplace is insufficient to establish an adverse employment decision. (*Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 929; *Strother v. Southern California Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 869.) However, " '[W]orkplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for . . . retaliation cases.' [Citation]." (*Yanowitz, supra*, 36 Cal.4th at p. 1056, fn. 16.) The issue, however, is whether there was an adverse employment action for which *Conco* was responsible.

Section 12940(h) does not specifically address whether an employer can be held liable for retaliation by nonmanagement employees. Few California courts have considered the issue. In *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 1007 [112 Cal.Rptr.2d 347], the court stated that a FEHA retaliation claim may be based on the acts of a coworker, but did so relying on cases dealing with the scope of an employer's duty to remedy harassment, and it did not discuss the scope of an employer's liability for retaliation by a coworker.

---

subdivision (a). (*Yanowitz, supra*, 36 Cal.4th at p. 1052.) Discriminatory actions under section 12940, subdivision (a) include a refusal to hire or employ.

In *Yanowitz*, our Supreme Court cited with approval *Gunnell v. Utah Valley State College* (10th Cir. 1998) 152 F.3d 1253, 1264 (*Gunnell*) for the proposition that "coworker hostility or retaliatory harassment, if sufficiently severe, can constitute adverse employment action for purposes of a title VII retaliation claim." (*Yanowitz, supra*, 36 Cal.4th at p. 1061.) In *Gunnell*, the court held that "an employer can only be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions. . . . An employer may not be held liable for the retaliatory acts of co-workers if none of its supervisory or management-level personnel orchestrated, condoned, or encouraged the co-workers' actions, and no such management participation could occur if the supervisory or management-level personnel did not actually know of the co-workers' retaliation." (*Gunnell*, at p. 1265, citation omitted; see also *Knox v. State of Indiana* (7th Cir. 1996) 93 F.3d 1327, 1333–1336 (*Knox*) [jury correctly instructed that employers can be liable under title VII for coworker retaliatory actions "when they know about and fail to correct the offensive conduct"].)

While no evidence was presented here that any Conco supervisory personnel orchestrated retaliatory action against Kelley, he did aver that he complained about this conduct to Scott Nava "two [to] three times a week" and at least one other person ("Tony") at Conco on two or three occasions about the behavior.[13] He alleged that an unidentified Conco supervisor was within earshot when some of the comments were made, but ignored them. Kelley said that the company did move him to other jobsites in response to his complaints, but he also said that Nava told him, " 'Well, that's the way the trade is, man. That's just the way these guys are.' "

We agree that an employer may be found to have engaged in an adverse employment action, and thus liable for retaliation under section 12940(h), "by permitting . . . fellow employees to punish [him] for invoking [his] rights." (*Knox, supra*, 93 F.3d at p. 1334.) We therefore hold that an employer may be held liable for coworkers' retaliatory conduct if the employer knew or should have known of the coworkers' retaliatory conduct and either participated and encouraged the conduct, or failed to take reasonable actions to end the retaliatory conduct.

---

[13] At oral argument, counsel for Conco argued that Nava was merely a "dispatcher" and not a supervisor whose knowledge could be imputed to Conco. For purposes of summary judgment, the evidence established that Nava had sufficient supervisory authority to redirect employees to alternative job locations at his discretion. While Kelley would have the burden of proof on this issue at trial, on summary judgment the defendant "must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not . . . ." (*Aguilar, supra*, 25 Cal.4th at p. 851.)

■ "Retaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context. . . . [T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." (*Yanowitz, supra,* 36 Cal.4th at p. 1052, fn. omitted.) " '[A] series of alleged discriminatory acts must be considered collectively rather than individually in determining whether the overall employment action is adverse [citations] and, in the end, the determination of whether there was an adverse employment action is made on a case-by-case basis, in light of the objective evidence.' [Citation.]" (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1063 [119 Cal.Rptr.3d 878].)

Kelley has raised triable issues as to whether coworkers engaged in retaliatory harassment sufficiently severe to constitute an adverse employment action, whether Conco had actual or constructive knowledge of the improper conduct, and whether it took appropriate action in response. Summary adjudication of this cause of action was therefore improper.

E.   *Termination in Violation of Public Policy*

The trial court granted summary adjudication to Conco on Kelley's claim for termination in violation of public policy because Kelley "failed to show that Conco's assertion that it terminated his employment on November 8, 2006 because he was dropped from the ironworkers apprenticeship program was false or against the public policy of the State of California as expressed through its statutes and regulations."

■ Sex discrimination in employment may support a claim of tortious discharge in violation of public policy. (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 70–71, 90–91 [276 Cal.Rptr. 130, 801 P.2d 373].) For the reasons stated *ante,* we conclude that Kelley has not shown Conco discharged him because of sex or in retaliation for his complaints. Rather, Conco discharged Kelley because he had been suspended by the union and Kelley has not produced evidence that would support an inference that Conco contributed to the union's decision to suspend Kelley.

Kelley does not cite legal authority that an employer is liable in tort for failing to rehire an employee in violation of public policy. (Cf. *Daly v. Exxon Corp.* (1997) 55 Cal.App.4th 39, 45 [63 Cal.Rptr.2d 727] [no tort liability for failing to renew written employment contract for fixed term in violation of

public policy].) In any event, Kelley has not raised a triable issue about whether Conco directly or constructively refused to rehire him after the expiration of his union suspension.

We affirm the trial court's grant of summary adjudication of this claim.

## F. *Intentional Infliction of Emotional Distress*

The trial court granted summary adjudication to Conco on Kelley's claim for intentional infliction of emotional distress, explaining, "Although the Court does not accept Defendants' contention that failure of the First Cause of Action [for sexual harassment] precludes the possibility that [Kelley] can prevail on the Fifth Cause of Action [for intentional infliction of emotional distress], the Court does not find sufficient evidence in the record to support [Kelley's] assertion that the conduct of Seaman and other Conco employees was 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.' *See Garamendi v. Golden Eagle Ins. Co.* (2005) 128 Cal.App.4th 452, 480 [27 Cal.Rptr.3d 239]. Although the Court regards the conduct of Defendant Seaman as despicable and wholly unnecessary to his supervisory duties over [Kelley], the Court must consider the context in which it occurred."

"A cause of action for intentional infliction of emotional distress exists when there is ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' [Citations.] A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.] And the defendant's conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' [Citation.] [¶] Liability for intentional infliction of emotional distress ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' [Citations.] If properly pled, a claim of sexual harassment can establish 'the outrageous behavior element of a cause of action for intentional infliction of emotional distress.' (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 618 [262 Cal.Rptr. 842].) [¶] With respect to the requirement that a plaintiff show severe emotional distress, this court has set a high bar. 'Severe emotional distress means " 'emotional distress of such substantial

quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.' " ' [Citation.]" *(Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051 [95 Cal.Rptr.3d 636, 209 P.3d 963].)

"An employer is liable for the wilful and malicious torts of its employees committed in the scope of employment. [Citation.]" *(Fisher v. San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 618.) In order to hold Conco liable for the tort of intentional infliction of emotional distress, Kelley must show that he was the victim of harassment that amounted to outrageous conduct, that the harasser was a Conco employee, and that the employee was acting within the scope of his employment when he harassed Kelley. (See *ibid.*)

As the trial court observed, the context in which Seaman's behavior occurred is significant. In the environment in which Kelley was employed, profanity, vulgarity and sexual taunting were commonplace and apparently generally accepted. Whether Seaman's behavior in that setting would be considered "so extreme as to exceed all bounds of that usually tolerated in a civilized community" is at least arguable. But even if we assume for purposes of argument that Seaman's conduct was sufficiently extreme and outrageous behavior to be actionable, we conclude Kelley cannot establish an intentional infliction tort claim because the record does not support an inference that he suffered severe emotional distress as a result of that harassment.

Although a reasonable fact finder could find that Kelley ultimately suffered serious distress,[14] the evidence of that severe distress (severe depression causing him to take a leave of absence and ultimately resign from the union and to check himself into a hospital for psychiatric observation) occurred over a year later, in October 2007, and arose not from his single confrontation with Seaman on July 30, 2006, but only in response to his union suspension and the retaliatory harassment he suffered thereafter at both Conco jobsites and elsewhere. While Kelley described his emotional reaction while he was discussing Seaman's actions with Gallegos, he attributed no other harm or injury to that discrete incident. Before Kelley's suspension from the union, Kelley continued to work regularly and appeared to have a good relationship with his Conco supervisor on his last job with the company. The severe depression did not arise until Kelley later lost his ability to work as an ironworker. Since he cannot causally attribute his severe emotional distress to Seaman's conduct, and thereby to Conco, he cannot establish a necessary element of this cause of action.

---

[14] Kelley said that he experienced stress, sexual impotence, fatigue, overeating, short temper, withdrawal, bouts of crying, depression, and sleeplessness for which he took medication.

## III.  DISPOSITION

The grant of summary judgment is reversed. Summary adjudication of the second cause of action is reversed. Summary adjudication of all other claims is affirmed. The parties shall bear their own costs on appeal.

Jones, P. J., and Simons, J., concurred.