Filed 5/14/15  Bryant v. SF Mun. Transp. Agency CA1/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ANTHONY BRYANT,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY,<br><br>    Defendant and Respondent. | A140233<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-12-520229) |

Plaintiff Anthony Bryant had been employed as a project manager by defendant San Francisco Municipal Transportation Agency (MTA) since 1999.  In February 2008, he filed an internal complaint of discrimination, alleging his supervisors treated him unfavorably because of his race.  The complaint was not resolved until January 2009, when MTA concluded it was unfounded.  That same month, Bryant and the other project managers were assigned a new supervisor.  One month later, the new supervisor, in consultation with the head of Bryant's division, demoted Bryant, purportedly on the basis of his deficient work performance, unexplained absences from work, and insubordination.

Bryant filed an action under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA), contending he had been demoted in retaliation for his filing of the 2008 complaint of discrimination.  MTA filed a motion for summary judgment, arguing there was no evidence to suggest the new supervisor, who was not named in Bryant's discrimination complaint, was motivated by retaliatory animus.  In

response, Bryant presented evidence that his job performance, as evaluated by his prior supervisors, had never been questioned and argued the claim of poor job performance was a pretext. The trial court found Bryant's evidence insufficient and granted the motion. We affirm.

## I. BACKGROUND

Bryant's first amended complaint for damages (complaint) against MTA, filed in March 2013, alleges he has been employed by MTA since 1997, as an assistant electrical engineer. In September 1999, he was promoted to the "provisional position" of project manager I, and in 2004, he was promoted again to project manager II. Bryant continued in that role until February 2009, when he was effectively demoted through termination from his provisional position.

In 2004, and again in February 2008, Bryant, an African-American, had filed administrative complaints asserting he was subjected to racial discrimination in connection with his work. The complaint alleges that in response to the first administrative complaint, Bryant was promoted to the position of project manager II. He received no response to the second administrative complaint, which was filed with MTA's office of equal employment opportunity, until January 2009, when MTA found the administrative complaint to be without substance. His demotion occurred one month later. The complaint alleges the purported grounds for his demotion were "baseless and pretextual" and the true motivation for his demotion was retaliation for his filing of the administrative complaint of discrimination. The complaint pleaded causes of action for unlawful retaliation, declaratory relief, and injunctive relief.

MTA filed a motion for summary judgment in April 2013. In support of the motion, MTA submitted declarations and documents demonstrating the following. Bryant works in the capital programs and construction division of MTA (division), which oversees certain capital improvement programs of MTA, such as upgrades to existing facilities, system enhancement, and maintenance. Each of these projects is overseen from beginning to end by a project manager. Project manager positions range from project manager I through IV, depending upon the complexity and expense of the projects

2

managed, and project managers are generally in charge of several projects at a time. Each project has a scope, budget, and schedule, and project managers are the persons ultimately responsible for completing the project as planned. Appointments to the position of project manager are made for a specified time, typically between one and three years, and may be renewed at the discretion of the division head. Bryant was originally appointed project manager I in 1999, an appointment that was renewed twice before he was appointed project manager II in 2004.

Bryant filed a charge of discrimination with the federal Equal Employment Opportunity Commission (EEOC) in May 2004, naming the division director, Vincent Harris, and the supervisor of the project manager unit, Kenneth Jew. The charge alleged Bryant had been carrying out the duties of a project manager II while being held in the position of project manager I and claimed the failure to promote him was motivated by racial animus. The outcome of this charge is unclear from the record, but MTA asserts in its respondent's brief that Bryant withdrew the charge after he was promoted to project manager II in June 2004.[1]

Bryant filed an internal complaint of discrimination with MTA on February 26, 2008 (2008 complaint). The 2008 complaint alleged Bryant was given fewer and less meaningful work assignments than his peers, his projects were given less support by MTA, his projects and support staff were reassigned to others, and supervisory personnel were unresponsive to his concerns. Bryant believed the disparate treatment resulted both from discrimination and retaliation for his 2004 charge of discrimination. He assigned responsibility to Jew and Andrew Howard, Jew's 2006 replacement as Bryant's immediate supervisor. MTA investigated the 2008 complaint and, in a letter dated January 30, 2009, concluded his allegations of racial discrimination were unsupported.

---

[1] Documents submitted by MTA show that Harris had requested Bryant's promotion in March 2004, two months prior to his charge filing. This appears to contradict Bryant's allegation in the complaint that he was promoted to project manager II as a result of his filing of the EEOC charge.

3

According to the employee assigned to investigate the 2008 complaint, her "heavy workload" had delayed completion of the investigation until the end of 2008.

The head of the division in 2008 was Carter Rohan. In June 2008, Rohan assigned a longtime MTA employee and former project manager, Fariba Mahmoudi, to supervise the project managers. When first appointed, Mahmoudi was not Bryant's immediate supervisor; rather, she supervised Bryant's supervisor, Andrew Howard. It was not until January 2009, when Howard was transferred, that Mahmoudi became Bryant's direct supervisor.

One of the first tasks Mahmoudi was given in her new position was to review the state of all pending capital projects. At the time, Bryant was in charge of seven projects. During December 2008 or January 2009, Mahmoudi "discovered that most of his projects were significantly over budget and behind schedule," one as much as 50 percent over budget and nearly four years behind its original schedule. Bryant had also been slow to report the cost increases and schedule delays. As reported by Bryant, the costs for three of the projects held steady for the first three quarters of 2008, only to rise substantially in the last quarter. In Mahmoudi's experience, costs did not rise suddenly in that manner. On the basis of this information, Mahmoudi concluded Bryant's management "fell far short of the performance [MTA] reasonably can expect from its project managers." Mahmoudi recognized that costs and schedules were sometimes subject to forces outside the control of individual project managers, but "nearly every project manager in the Division" experienced similar problems without suffering the delays and cost overruns experienced by Bryant's projects. As she concluded, "even accounting for the problems beyond his control, the sheer extent of the cost overruns and the delays on Mr. Bryant's projects showed to me his unacceptable project management failures, both objectively and in comparison with the performance of Mr. Bryant's peers."

In early 2009, Mahmoudi met with her direct supervisor, Raj Shah, and Rohan several times to discuss Bryant's performance. Some of the meetings were occasioned by "complaints about Mr. Bryant's performance from community members, a member of the Board of the Supervisors [*sic*], and agency clients." In addition to his purported

4

management failures, there were concerns expressed about Bryant's "frequent unexplained absences from the office." Mahmoudi claimed she attempted to discuss with Bryant her conclusions about his work performance, but Bryant "resisted any discussion of his performance." She and Shah did, however, discuss the absences with him. Bryant said he had left work several times to visit his grandmother, who was ill. When Mahmoudi checked Bryant's time sheets, she found Bryant reported these occasions as work time, rather than time off.

Things came to a head in late February 2009. On February 23, Mahmoudi sent Bryant an e-mail requesting that he attend a meeting on February 25. Bryant had been designated "interim" project manager for one of the projects to be discussed at the meeting, and he was upset not to have been assigned the position outright. In a subsequent exchange of e-mails, Bryant implied he would not attend the meeting and declined to take responsibility for the project to which he had been assigned on an interim basis, insisting that Mahmoudi forward the meeting notice "to the appropriate P[roject] M[anager]." At the time scheduled for the meeting, Mahmoudi, who was accompanied by a city official, passed Bryant in the hallway and asked why he was not at the meeting. Bryant responded, "with a very rude and unprofessional tone of voice and gesture . . . [¶] 'do you want to take it here or in my office?' " When she asked again for an explanation for his failure to attend the meeting, Bryant said, "with [a] very rude gesture again: [¶] 'do you want to take it here or in my office? I am going to my office now' and he walked away without providing any answer." The city official accompanying Mahmoudi was so startled by Bryant's comments that he told her he intended to report the incident to Rohan and encouraged her to take disciplinary action against Bryant.

As a result of Bryant's insubordination, Rohan and Mahmoudi decided to suspend him briefly. In December 2008, Bryant had been promoted to the position of associate engineer, subject to a six-month probationary period. Mahmoudi and Rohan also terminated this appointment, causing Bryant to revert to his prior position of assistant engineer, and ended his assignment as a project manager. These actions were "based on the accumulated weight of Mr. Bryant's poor performance as project manager, frequent

5

unexplained absences, and resistance to taking direction to improve." Bryant's suspension was upheld in response to a grievance, but MTA later reduced it to a written warning.

Mahmoudi found similar, if less extreme, deficiencies in the performance of two other project managers. One of these was not renewed as a project manager when his term expired, and the other retired. Mahmoudi reassigned Bryant's projects to two other project managers. One of these was "relieved of her project manager assignment" after Mahmoudi concluded she was performing unsatisfactorily.

In response to MTA's motion, Bryant submitted his own declaration and other evidentiary materials. Bryant's declaration was devoted primarily to a defense of his work performance. He did not dispute the fact of the project delays, but he blamed them on "circumstances outside of my hands including staffing shortages and work assignment changes" and submitted materials documenting the various circumstances. Bryant explained he was not provided proper support for his projects, which he attributed in part to "discrimination and retaliation." The declaration documents his discussions with others, largely his supervisors, Jew and Howard, about the problems. Bryant similarly did not dispute the fact of the cost overruns on certain of his projects, which he also attributed to factors outside his control, such as increases in the price of supplies.

Bryant also submitted copies of favorable performance evaluations. A September 2007 memorandum from Howard, for example, described Bryant's work as "competent and effective." Toward the end of 2008, Bryant worked with Howard to prepare a work plan for 2009. During this work with Howard, Bryant says, he was never "counseled for poor performance, told my job was in jeopardy, informed that the delays and budget overruns were somehow my fault and I would be ultimately blamed for it, or anything of the like." As noted above, Bryant was actually promoted to associate engineer three months before his demotion.

All of the documentary materials submitted by Bryant date from 2007 and 2008, prior to Mahmoudi's direct involvement in his supervision. Other than a status report sent to Mahmoudi at her request in July 2008, apparently as part of her initial review of

6

projects, none of the documents involved Mahmoudi. Bryant claimed to have cooperated with Mahmoudi after her appointment as his supervisor, submitting as evidence an e-mail he sent to her in which he stated, somewhat ambiguously, "I hope and trust that this action [presumably her appointment as project manager supervisor] was supported by other personnel. If there's anything I can assist with then please let me know." As to the missed meeting, Bryant said he had already committed to attend a meeting scheduled for 6:00 the same evening in a different location, which he believed conflicted with his attendance at the 4:00 p.m. meeting Mahmoudi directed him to attend. He also claimed he believed he was no longer the project manager on the project to be discussed. Bryant does not dispute that he never informed Mahmoudi of the other meeting.[2] Bryant's account of the encounter in the hallway was similar to that of Mahmoudi, but he contended his request to go to a private office was appropriate under the circumstances. Bryant denied frequent unexplained absences and claimed to have properly informed Shah about the visit to his grandmother. He did not, however, deny having failed to record the time as time off.

Bryant submitted no evidence connecting Rohan and Mahmoudi to the 2008 complaint.[3] In its response to Bryant's separate statement, MTA effectively conceded that Rohan and Mahmoudi were aware of the complaint, but there is no indication either was otherwise involved. During the course of the investigation of the 2008 complaint, the MTA employee who conducted the investigation interviewed and received written statements from Howard, Jew, and another person involved in supervising Bryant's work, but there is no indication that either Rohan or Mahmoudi was contacted. In her

---

[2] In the e-mails exchanged between Bryant and Mahmoudi prior to the missed meeting, copies of which were submitted by MTA, Bryant never mentioned the later meeting. On the contrary, his communications were curt and dismissive, offering no explanation other than his refusal to acknowledge his responsibility as the interim project manager.

[3] In arguing below, Bryant pointed to limited evidence implicating Shah, who had referred to him as a "troublemaker" in the fall of 2008. There is no evidence, however, that Shah was involved in the decision to demote Bryant, and Shah denied any involvement.

deposition, Mahmoudi confirmed she was "never involved in any of those complaints and didn't know the details of it."

The trial court granted the motion, holding Bryant "cannot establish a prima facie case for retaliation because there is no causal nexus between the protected activity and the adverse employment action. Plaintiff complained to defendant's HR department in February 2008 and the demotion occurred February 2009. There is no inference of causation given the year long gap. . . . In addition, it is not reasonable to infer that the decisionmakers (Ms. Mahmoudi and Mr. Rohan) harbored a retaliatory animus. They were not the subjects of the February 2008 complaint. Lastly, Defendant presents a legitimate, non-retaliatory reason for its conduct and Plaintiff does not present substantial responsive evidence showing pretext."

## II. DISCUSSION

Bryant contends the trial court erroneously granted summary judgment on his claim for unlawful retaliation. In his opening brief, Bryant argues the trial court erred in weighing the evidence submitted by the parties, in concluding his evidence failed to support a reasonable inference his demotion was motivated by retaliatory animus, and in overruling an objection by Bryant to the admission of an e-mail between Bryant and the EEOC. In his reply brief, submitted with the assistance of counsel, Bryant additionally argues the trial court, in granting summary judgment, improperly applied the burden-shifting analysis applicable to trial and resolved disputed issues of fact that should have precluded summary judgment, and claims MTA's brief contains improper record citations.[4]

---

[4] Bryant also contends in his reply brief that Mahmoudi and Rohan were "not the 'decisionmakers,'" contending instead that a person in the labor relations office of MTA was responsible. Even if this argument were not waived by being raised for the first time in reply, it is not supported by the record. The evidence cited by Bryant demonstrates only that the labor relations department may have made the decision to suspend Bryant rather than issue a letter of warning, as Mahmoudi was initially inclined to do. Regardless, the suspension was never enforced. The evidence is undisputed Mahmoudi and Rohan made the decision to demote Bryant, the adverse employment action that is the subject of his complaint.

Under FEHA, "It is an unlawful employment practice for an employer to 'discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . .' " (*Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 209.) At trial, such retaliation claims are subject to a three-part analysis. Initially, the employee must establish a presumption of wrongful conduct by demonstrating a prima facie case of retaliation. To establish the prima facie case, " 'a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' " (*Ibid.*) To rebut the presumption of wrongful conduct, the employer must respond "by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason. [Citations.] [¶] If the employer sustains this burden, the presumption of discrimination disappears." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355–356 (*Guz*).) Assuming defendant has met its burden, "The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Id.* at p. 356.)

On a motion for summary judgment brought by an employer on a claim of retaliation, the evidentiary burdens are somewhat different. As the moving party, the employer has the initial burden of "conclusively negat[ing] a necessary element of the plaintiff's case, or [demonstrating] that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz, supra*, 24 Cal.4th at p. 334.) Because the "ultimate issue when discriminatory discharge is alleged is what the employer's true reasons were for terminating the employee," the employer must negate the element of wrongful motive "by producing evidence of one or more reasons for the adverse employment action that were 'unrelated to unlawful discrimination.' " (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1524.) If the defendant has carried this burden, to avoid summary judgment " 'the employee must demonstrate a triable issue by producing

9

substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Id.* at p. 1529.)

As the Supreme Court elaborated in *Guz,* "an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th at p. 361, fn. omitted.) The court illustrated the nature of the analysis by quoting a decision of the United State Supreme Court, *Reeves v. Sanderson Plumbing Prod.* (2000) 530 U.S. 133: "*Reeves* made clear that even where the plaintiff has presented a legally sufficient prima facie case of discrimination, and has also adduced some evidence that the employer's proffered innocent reasons are false, the fact finder is not *necessarily* entitled to find in the plaintiff's favor. Thus, the court admonished, its holding should not be interpreted to mean 'that such a showing will *always* be adequate to sustain a . . . finding of liability. *Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance*, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. [Citations.] . . . [¶] Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . .' " (*Guz*, at pp. 361–362, second italics added by *Guz.*)

" ' " 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of

10

law. [Citations.] . . .' . . ." . . . We review the trial court's decision de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.' " (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705.)

## A. *Weighing of Evidence*

Bryant does not seriously dispute that he was over budget and behind schedule on some of his projects, but he submitted substantial evidence to demonstrate the problems were due to circumstances beyond his control, an explanation his earlier supervisors had apparently accepted. Whether Bryant should be faulted for the problems, as Mahmoudi believed, was therefore in dispute. In seeking to demonstrate retaliatory motive, Bryant argues his evidence supports a conclusion that the merit-based rationale for his demotion was unfounded, thereby permitting an inference of pretext. Because the evidence regarding the merits of his demotion was in conflict, he argues, the trial court necessarily weighed the credibility of this evidence in concluding there was no evidence of a causal nexus between his demotion and his discrimination complaint.

For reasons grounded in the particular circumstances surrounding Bryant's demotion, we do not agree the dispute regarding the reasons for the deficiencies in Bryant's projects *necessarily* created a triable issue of pretext. This is not a situation in which a manager did a sudden and suspicious "about-face" in evaluating an employee's work. While Bryant provided evidence his supervisors had found his performance adequate despite the delays and overruns, all of this evidence relates to his earlier supervisors, Jew and Howard. Mahmoudi did not become his direct supervisor until January 2009, shortly before she and Rohan made the decision to demote him. There is no evidence Mahmoudi was involved in earlier performance reviews or was aware of his explanation for the substandard status of his projects. As Mahmoudi described in her declaration, her conclusions about his job performance were based on her own review of the status of his projects, undertaken without apparent input from Jew and Howard. Further, she rejected the possibility there could have been any adequate explanation for the deficiencies, given their scale, and appears to have made little or no attempt to

11

determine whether there might have been mitigating circumstances. Mahmoudi effectively demoted three other project managers for similar reasons. While her approach may not have been fair to Bryant, FEHA does not require the rationale for adverse employment actions to be wise or correct. It imposes liability only for those that are motivated by discrimination or retaliation. (*Guz, supra,* 24 Cal.4th at p. 358.) Given these circumstances, the fact that Bryant's earlier supervisors had not faulted his work performance does not necessarily call into question the good faith of Mahmoudi's conclusion that his work was deficient.

Further, Mahmoudi's decision to demote Bryant was not based solely on his allegedly deficient job performance. She was also concerned about his absences and his insubordination. While Bryant contended his absences were not unexplained, he did not dispute Mahmoudi's conclusion that he falsely recorded himself as being at work when he was actually visiting his grandmother. Nor did he materially contradict the details of her account of his insubordination in connection with the missed meeting. That conduct was sufficiently disrespectful that it alone could have motivated serious disciplinary action by a superior. For these reasons, the existence of valid excuses for the deficiencies in Bryant's projects did not raise a triable issue of pretext with respect to Mahmoudi's and Rohan's decision to demote him.

## B. *Reasonable Inference*

Bryant also contends the trial court erred in concluding he failed to submit evidence sufficient to support a reasonable inference of retaliatory motive.

We agree with the trial court that Bryant failed to carry his burden. Because the 2008 complaint was filed nearly a year before the decision to demote him, there was little temporal connection between the two. Further, the 2008 complaint had no substantive connection to the two decision makers. Bryant accused neither Rohan nor Mahmoudi of discriminatory conduct in the 2008 complaint. Because Mahmoudi had no authority over Bryant during the time period covered by the 2008 complaint, it did not impugn her work performance or character in any way. There is no evidence either of them was involved in its investigation and resolution. While they were presumably aware of the complaint,

12

he provided no evidence to suggest this knowledge alone would have caused them to retaliate. In short, Bryant submitted no evidence to suggest his filing of the 2008 complaint provided either Rohan or Mahmoudi with a reason to retaliate against him.

In light of the lack of any evidence of a connection between the decision makers and the 2008 complaint, a reasonable inference of retaliatory motive would require substantial evidence of pretext on their part. As discussed above, however, the evidence of a legitimate, nondiscriminatory motive was solid. Several of Bryant's projects were behind schedule and overbudget, causing Mahmoudi to infer his work performance was deficient. When she investigated his absences, she found he had not accounted for them properly, and he was contemptuously insubordinate towards her. Given this evidence, the fact that Bryant's earlier supervisors had accepted his explanations for the cost overruns and delays did not create a basis for inferring pretext.

Bryant argues the trial court erred in concluding that the 2008 complaint was too distant in time from the demotion to support an inference of retaliation and contends the timing should be measured from the date of MTA's response, which was issued less than a month from his demotion. As explained above, the timing of the demotion is merely one of the factors that argue against a retaliatory motive. More significant is the fact that the 2008 complaint did not implicate the decision makers, Rohan or Mahmoudi, in any way, and thereby provided them no reason to retaliate. That said, we find no reason to measure the time period for inferring retaliation from the date of MTA's response. Because the response essentially exonerated MTA, it provided no fresh motive to retaliate; if anything, it alleviated a basis for retaliation. Further, Bryant provided no evidence that Rohan and Mahmoudi were even aware of the complaint's resolution.

## C. *Admission of EEOC Evidence*

Bryant contends the trial court erroneously overruled his objection to MTA's submission of an e-mail he received from the EEOC, informing him it found no basis for a charge of discrimination he filed in connection with his demotion.

We decline to address the merits of the trial court's action because any erroneous admission of this e-mail was not prejudicial. On summary judgment, as at trial, " 'an

13

erroneous evidentiary ruling requires reversal only if "there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 857.) Given the wealth of evidence submitted by both sides, the EEOC's conclusory statement is of marginal relevance to the resolution of MTA's motion. There is no indication the EEOC's conclusions on this score influenced the trial court's decision, and they have played no role in our resolution of this appeal.

### D. *Burden-shifting*

In his reply brief, Bryant argues the trial court, in analyzing the summary judgment motion, improperly applied the burden-shifting analysis applicable at trial. This argument was forfeited when Bryant failed to raise it in his opening brief, thereby depriving MTA of a fair opportunity to respond. (*Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1328–1329, fn. 9.)

In any event, we disagree with the premises of Bryant's argument. Bryant contends, and we agree, the initial burden of proof in a summary judgment motion on a claim under FEHA, lies with the moving party defendant, which must demonstrate a nondiscriminatory basis for the adverse employment action. We disagree with Bryant, however, that the plaintiff employee need only respond with prima facie evidence of discrimination. On the contrary, as discussed above, the law is clear that the plaintiff must respond with evidence sufficient to support a reasonable inference of improper motive. (E.g., *Guz, supra*, 24 Cal.4th at pp. 361–362.) Ultimately, the trial court concluded, as we did, that the evidence was insufficient to support such an inference.

Further, we disagree with Bryant that any error by the trial court in applying this burden of proof is reversible per se. Because we review the trial court's decision de novo, there is no reason to find an error in the trial court's legal analysis to be reversible per se, and Bryant cites no decisions to the contrary. In the lead case cited by Bryant, *Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, for example, the court did not find the trial court's error to be reversible per se. Rather, it concluded, independently of the trial court's analysis, that the defendant failed to present a prima facie case for summary

14

judgment and reversed on that basis.  (*Id.* at p. 943.)  The other cases are the same.
Reversal is warranted only if there was no proper basis for summary judgment.  As
discussed at length above, summary judgment was proper here.

**E.  *Disputed Issues of Fact***

Bryant's argument in his reply brief that disputed issues of fact should have
precluded summary judgment is essentially identical to his argument that the trial court
improperly weighed the evidence.  As discussed above, we recognize the issue of the
reasons for the delays and cost overruns was in dispute, and the decision of Rohan and
Mahmoudi to demote Bryant, to the extent it was based on deficient work performance,
might have been unfair or misinformed.  FEHA does not address this type of error.  (*Guz,
supra*, 24 Cal.4th at p. 358.)  Rather, Bryant was required to supply evidence sufficient to
support a reasonable inference his demotion was motivated by retaliatory animus arising
from his 2008 complaint.  For the reasons discussed above, there was no evidentiary basis
for such an inference here.

**F.  *Improper Record Citations***

Bryant's argument that MTA's brief should be disregarded because its record
citations are insufficient is bold, to say the least, given his failure to provide *any* record
citations in his opening brief and our decision to disregard that failure.[5]

Putting his hubris aside, Bryant argues the citations were improper because
(1) MTA cites to its separate statement, rather than directly to the underlying evidence,
and (2) MTA cites to evidence submitted in connection with an earlier summary
judgment motion, which was withdrawn, rather than to evidence submitted with the
motion for summary judgment granted by the trial court.  The argument is unfounded.
Contrary to Bryant's claim, the bulk of MTA's citations are to the record evidence, not to
the separate statements.  Further, the documents submitted in MTA's augmentation of the
record were filed in connection with a motion for summary judgment noticed for hearing

---

[5] On August 7, 2014, we denied a motion to dismiss filed by MTA, premised on
Bryant's failure to provide record citations in his pro se opening brief.

15

in July 2013, the same motion on which the trial court granted summary judgment. MTA's record citations therefore referred to the proper evidence. We find nothing in MTA's manner of briefing to justify a reversal of the trial court's order.

### III.  DISPOSITION

The judgment of the trial court is affirmed.

_____

Margulies, J.

We concur:

_____

Humes, P.J.

_____

Banke, J.