Filed 7/22/15  Gonzalez v. Mission Neighborhood Health Center CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CINTYA GONZALEZ,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>MISSION NEIGHBORHOOD HEALTH<br>CENTER et al.,<br><br>        Defendants and Respondents. | A140075<br><br>(San Francisco County<br>Super. Ct. No. CGC-12-517610) |

Plaintiff Cintya Gonzalez was terminated from her employment with defendant Mission Neighborhood Health Center (Mission) after receiving a series of written reprimands spanning a period of about 20 months.  She brought this action against Mission and some of its officers[1] for wrongful termination, alleging claims including age and disability discrimination, family-leave retaliation, and breach of contract.  The trial court granted summary judgment in defendants' favor.  Before doing so, it imposed sanctions against Gonzalez and her attorney for spoliation of evidence.  We affirm the trial court's rulings, except we reverse the portion of the sanctions order imposing monetary sanctions against Gonzalez's attorney.

---

[1] The individual defendants are Brenda Storey, Mission's chief executive officer; Fernando Gomez-Benitez, its chief administrative officer and deputy director; and Charles Moser, the president of its board of directors.

1

BACKGROUND

A.      The Facts.

The facts are largely undisputed, although the parties disagree about how they should be interpreted.  Mission is a "community health center" that provides health care services to the medically underserved.  Gonzalez began working at Mission in 2002.  At the time of her termination in 2010, she was a patient service coordinator at a medical clinic on Mission Street in San Francisco.  It appears that many of the clinic's patients are native or fluent Spanish speakers, as are Gonzalez and many of the clinic's other employees.

Gonzalez received the first in the series of reprimands in February 2009 after she got into an argument with two other employees.  Her supervisor intervened to stop the argument and directed the three employees to meet in the supervisor's office, but Gonzalez refused to attend the meeting.  As a result of the argument and her insubordination, Gonzalez received a written warning and was required to attend an anger-management program.

In January 2010, Gonzalez got into another argument, this time with a different coworker, a supervising physician, after she refused to obey the physician's directions.  An investigator consultant was hired by Mission, and the consultant reported that Gonzalez's coworkers believed that Gonzalez was unprofessional in dealing with others, did not assist in busy times, was absent for long periods during the day, and gave preferential treatment to certain patients.  As a result of the argument and report, Gonzalez received another written warning, and her continued employment was made subject to a written "performance plan" (the plan).  The plan required Gonzalez to conduct herself in a professional manner, including speaking respectfully to others, using a "normal tone of voice," and dealing with conflicts in an "unemotional way."  A copy of her job description was attached, and she was reminded that her job was to coordinate patients, not to supervise other employees.  The final paragraph stated, in part, "If you do not meet the requirements of this plan, further disciplinary action may be taken, up to an[d] including termination of your employment."  Gonzalez refused to sign the warning.

2

A week after she was given this second written warning, Gonzalez took a previously approved two-month leave of absence for bunion surgery. When she returned, she assumed her prior position.

In June 2010, Gonzalez's supervisor learned that Gonzalez had told a coworker, a person who Gonzalez did not supervise, that the coworker's performance was deficient and that the coworker's name could be placed on a lay-off list if the coworker's performance failed to improve. The union shop steward reported that the remark upset the coworker. After Gonzalez acknowledged making the remark, she was given a third written reprimand. This one stated that Gonzalez had violated the terms of the plan, and it admonished her, "This memo will serve as a final reminder that you must meet the expectations of [the plan] at all times. If you do not meet the requirements of this plan going forward, further disciplinary action may be taken, up to and including termination of your employment." The next month, Gonzalez began a two-month, stress-related leave of absence.

Two weeks after Gonzalez returned to work, in October 2010, a male coworker complained that she had used the Spanish word "chingado"—a word he viewed as equivalent to the English word "fuck"—in front of clients. As he explained, "when [Gonzalez] came in to the work area and saw the long line of patients waiting [she] said 'Chingado!' [The coworker] stated that patients heard [Gonzalez] as she was standing right behind him and he was helping a patient not more than 2 feet away from their work space." At a meeting on a Friday following the incident, Gonzalez did not deny using the word, and she was told the matter would be discussed again at a meeting on the following Monday. Gonzalez responded she would not be at work on Monday because she had an appointment with her psychologist. Mission ultimately decided to terminate Gonzalez on the ground that her language constituted a violation of the plan and prior warnings. When Gonzalez returned to work on Tuesday, she was told that she had been terminated. Although her psychologist had placed her on disability leave at the prior day's appointment, Gonzalez did not mention this when she was told that she was being terminated.

3

In a declaration filed in opposition to the summary judgment motion, Gonzalez disputed some circumstances surrounding her reprimands. Regarding the argument with the physician, she stated that the physician had given her directions that she was required to disobey because they directly contradicted instructions from her supervisor who was absent that day. When Gonzalez "tried to discuss this" with the physician, the physician "treated [her] badly." She claimed that Mission officials refused to listen to her side of the story during the subsequent investigation. And she claimed that when she returned from foot surgery, she was "punished" by having her desk put into a storage room, which she was forced to share with a coworker, and being given reduced supervisory duties. Gonzalez reported that Mission's deputy director, defendant Fernando Gomez-Benitez, told another worker that Gonzalez's leave for foot surgery was an intentional attempt on Gonzalez's part "to make the Clinic suffer without a supervisor." According to Gonzalez, when she returned from leave, Gomez-Benitez began to "harass" her on a "weekly basis."

Gonzalez claimed that another employee, Millie Cuevas, functioned as a "spy" for Gomez-Benitez and spread lies about her, and she claimed that substantial misconduct by Cuevas was tolerated, including the use of foul language at work. According to Gonzalez, instead of helping Gonzalez, Gomez-Benitez "called her names, incessantly criticized her work in an unreasonable manner, ignored pleas for help, and failed to develop a plan to enhance work performance." Gonzalez attested that Gomez-Benitez criticized her "otherwise satisfactory work performance" and called her a "witch" after she returned from disability leave in September 2010.[2]

Regarding the third incident, in which Gonzalez was reported to have told a coworker her performance was deficient, Gonzalez's declaration claimed that the subsequent warning was issued "without good reason" but did not dispute Mission's

---

[2] As Gonzalez explained in her deposition, when she answered a telephone at work after returning from leave, Gomez-Benitez was on the line. He said to Gonzalez, "It's nice to know that you're back at work. I have nothing personal against you. I don't go around cutting witches' head [*sic*] off." Gonzalez testified that she had no idea what he meant by the reference to "witches' heads."

4

account of the incident or otherwise explain Gonzalez's position.[3] Gonzalez asserted her termination for foul language was a "pretext," since her understanding of the word "chingado" is merely the equivalent of "I'm screwed," but she did not dispute having used the word in the presence of patients. She contended that Mission management intentionally distorted the true meaning of the word as a pretext for terminating her because of her "stress disability." According to Gonzalez, Gomez-Benitez had at one point told her that "taking leave for health reasons could get [her] fired."

B.      The Procedural Background.

In January 2012, Gonzalez brought this suit alleging 10 causes of action. Over the course of the litigation, she dismissed all of the claims against the individual defendants except a claim for harassment under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). In addition, her claims for intentional and negligent emotional distress were dismissed in their entirety. At the time of the hearing on the summary judgment motion, in addition to the harassment claim, the remaining causes of action were for wrongful termination in violation of public policy, discrimination in violation of the California Family Rights Act (CFRA) (Gov. Code, §§ 12945.1, 12945.2), age discrimination, disability discrimination, retaliation, failure to prevent discrimination and harassment, and breach of an express contract not to terminate except for cause.

In May 2013, about a month before they filed their motion for summary judgment, defendants filed two motions for sanctions. We need not discuss the first one because it is not challenged on appeal. The second one sought "issue, evidentiary, terminating, and monetary sanctions" against Gonzalez as a result of her alleged spoliation of evidence. The notice of motion filed in connection with this motion sought monetary sanctions only against Gonzalez, but the discussion of sanctions in the supporting memorandum of law concluded, "As a result of Plaintiff's abusive discovery tactics, Defendants request that this Court sanction Plaintiff *and her attorney* in the amount of $1,500.00 . . . ." (Italics

---

[3] Gonzalez also submitted a declaration from the coworker to whom she made the comments. The coworker confirmed that Gonzalez told her "that I better do my work well because they might put me on a list to be laid-off."

5

added.)  On the same page, the memorandum requested an order imposing sanctions only against Gonzalez.

According to two attorney declarations filed in support of the second sanctions motion, Gonzalez had filed an administrative charge of discrimination a year before she filed the complaint.  After she decided to file suit in August 2011, she asked for the charge to be dismissed.  At her deposition in August 2012, Gonzalez testified she had kept a journal while working at Mission in which she "wrote about [her] problems with [her] employment."  Gonzalez said she threw the journal away six months earlier, or around February 2012.  At the continuation of her deposition in March 2013, Gonzalez changed her testimony about the journal, stating she had discarded it "sometime after October 2011."  The declarations also detailed other, lesser events of alleged destruction of evidence by Gonzalez.

In declarations filed in opposition, Gonzalez's attorney stated that Gonzalez had no journal at the time she retained him in January 2012.  Gonzalez explained that the journal reminded her of her traumatic experiences at work.  By "the beginning of 2012," she put the journal in a box and gave it to her husband, telling him "to put it away as I did not want to be depressed about it anymore."  She did not learn until "months later" that he threw it away.  She explained that when she was first deposed she had testified that the journal was discarded after the litigation began because "I thought then that my husband had kept the journal in storage for me until about February 2012."  At her second deposition, she testified that the journal had probably been thrown away in October 2011 because "my husband told me at the end of 2012 that he had thrown the journal away much earlier than what I had thought in August."

The trial court partially granted the sanctions motion by entering the following order:  "Plaintiff admitted destroying or allowing to be destroyed a journal relating to her claims.  [¶] . . . [¶]  As such, Defendants are entitled to a jury instruction pursuant to Evidence Code [section] 413 and CACI No. 204 stating that the jury may infer that the destroyed journal was intentionally destroyed by Plaintiff and that the journal contained evidence unfavorable to Plaintiff's claims of (1) Disability Discrimination;

6

(2) Harassment; (3) Negligent Infliction of Emotional Distress; and (4) Intentional Infliction of Emotional Distress and the exact language of the instruction shall be determined by the trial judge." Although defendants' proposed order included monetary sanctions only against Gonzalez, the court revised the order and awarded monetary sanctions against both Gonzalez and her attorney. Gonzalez's motion for reconsideration was denied on the ground that Gonzalez failed to "offer any new facts, or at least ones that do not contradict the sworn evidence already in the record from [her], and no new circumstances or law."

In June 2013, defendants filed their motion for summary judgment. Regarding the discrimination and retaliation claims, they argued that there was a nondiscriminatory motive for terminating Gonzalez, and Gonzalez could not demonstrate a causal nexus between the termination and a discriminatory animus. Regarding the harassment claim, defendants argued that any improper conduct on their part was not of the nature and magnitude necessary for a statutory violation. Finally, defendants argued that Gonzalez did not have an employment contract requiring good cause for her termination.

The trial court granted the motion after issuing a tentative ruling explaining the basis of its order. The court generally found no evidence supporting Gonzalez's allegations that her termination was motivated by unlawful discrimination. Gonzalez filed a motion for reconsideration accompanied by a series of declarations. In denying reconsideration, the court held it "was not persuaded that its ruling granting the Motion for Summary Judgment was incorrect in any respect." It also found that "there were no new issues of fact or law presented that were not previously considered by the court in granting the motion."

DISCUSSION

Gonzalez appeals the trial court's grant of summary judgment, the denial of her motion for reconsideration, the award of monetary sanctions against her attorney, and the grant of instructional sanctions. We reject Gonzalez's claims and affirm the trial court's orders, except we reverse the portion of the sanctions order imposing monetary sanctions against Gonzalez's attorney.

7

A. Summary Judgment.

We begin by reviewing the applicable legal standards governing our review of a summary judgment. " ' " 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citation.] . . .' " We review the trial court's decision de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.' " (*Ennabe v. Minosa* (2014) 58 Cal.4th 697, 705.)

On a motion for summary judgment brought by an employer on a claim of employment discrimination, the employer has the initial burden of "conclusively negat[ing] a necessary element of the plaintiff's case, . . . such that the defendant is entitled to judgment as a matter of law." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) Because "[t]he ultimate issue when discriminatory discharge is alleged is what the employer's true reasons were for terminating the employee," the employer ordinarily must negate the element of wrongful motive "by producing evidence of one or more reasons for the adverse employment action that were 'unrelated to unlawful discrimination.' " (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1524.) If the defendant is able to carry this burden, to avoid summary judgment " 'the employee must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Id.* at p. 1529, italics in original.)

As the Supreme Court elaborated in *Guz,* "an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th at p. 361.) The court illustrated the nature of the analysis by quoting a decision of the United State Supreme Court, *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133: "*Reeves* made clear that even

8

where the plaintiff has presented a legally sufficient prima facie case of discrimination, and has also adduced some evidence that the employer's proffered innocent reasons are false, the fact finder is not *necessarily* entitled to find in the plaintiff's favor. Thus, the court admonished, its holding should not be interpreted to mean 'that such a showing will *always* be adequate to sustain a . . . finding of liability. *Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance*, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. [Citations.] . . . [¶] Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . .' " (*Guz*, at pp. 361-362, italics added by *Guz*.)

Here, Gonzalez does not seriously dispute that Mission established a nondiscriminatory basis for her termination. The record demonstrates a pattern of performance problems giving rise to three separate written warnings. Although Gonzalez characterizes the incidents as trumped-up charges intended to cover for discriminatory motives and contends Mission failed to listen to her side of the story about the incidents, she does not dispute her two angry confrontations or her insubordination. Further, Mission had reason to believe, on the basis of the outside consultant's report, that Gonzalez was unpopular with her coworkers, who had complained before she ever went on leave that she did not pull her weight. Thus, the burden therefore shifted to Gonzalez to produce "substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*." (*McGrory v. Applied Signal Technology, Inc.*, *supra*, 212 Cal.App.4th at p. 1529, italics in original.)

9

1. Retaliation Under CFRA.

The purpose of CFRA "is to allow employees to take leave from work for certain personal or family medical reasons without jeopardizing their job security. [Citations.] The CFRA has two principal components: a right to leave of up to 12 weeks in any 12-month period to care for a family member or for the employee's own medical condition [citation], and a right to reinstatement in the same, or a comparable, position at the end of the leave [citation]. [¶] . . . [¶] . . . [C]ourts have distinguished between two theories of recovery under the CFRA. . . . 'Interference' claims prevent employers from wrongly interfering with employees' approved leaves of absence, and 'retaliation' or 'discrimination' claims prevent employers from terminating or otherwise taking action against employees because they exercise those rights." (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 919-920.) "A plaintiff can establish a prima facie case of retaliation in violation of the CFRA by showing the following: (1) the defendant was a covered employer; (2) the plaintiff was eligible for CFRA leave; (3) the plaintiff exercised his or her right to take a qualifying leave; and (4) the plaintiff suffered an adverse employment action *because he or she exercised the right to take CFRA leave*." (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 491, italics in original.)

Gonzalez took two CFRA leaves. The first, beginning in February 2010, was because of her foot surgery. This leave was preplanned, and it began almost immediately after she received her second written reprimand and was placed on the plan. Gonzalez claims that when she returned to work her desk had been relocated to a less desirable location, and her duties were reduced. She also claims that Gomez-Benitez began harassing her. The second leave began in late July 2010 after Gonzalez had received her third written reprimand. She was terminated within three weeks after returning from this second leave.

The fact that Gonzalez's termination came after the two leaves might support an inference of leave-based retaliation if there were no evidence of Gonzalez's prior disciplinary history. But Gonzalez had already been given two written reprimands *before* her first CFRA leave. There is no reason to infer causation from the simple temporal fact

10

that the termination occurred after the leaves.[4]  "[T]emporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination.  [Citations.]  This is especially so where the employer raised questions about the employee's performance *before* [the employee] disclosed . . . symptoms, and the subsequent termination was based on those performance issues.  [Citations] . . .  [¶]  This is not to say that temporal proximity is never relevant in [deciding whether the employer's stated reasons for the termination were untrue or pretextual].  In the classic situation where temporal proximity is a factor, an employee has worked for the same employer for several years, has a good or excellent performance record, and then, after engaging in some type of protected activity— disclosing a disability—is suddenly accused of serious performance problems, subjected to derogatory comments about the protected activity, and terminated.  In those circumstances, temporal proximity, *together* with the *other* evidence, may be sufficient to establish pretext.  [Citations.]"  (*Arteaga v. Brink's, Inc.* (2008) 163 Cal. App. 4th 327, 353-354, italics in original.)  Here, those circumstances are simply not present.

Gonzalez also argues that the reasons given for her third reprimand and termination were pretextual because they were not sufficiently serious.  But again, these reasons must be viewed in the context of Gonzalez's work history.  At the time of her third reprimand and termination, she had already been given prior written warnings.  Furthermore, even if these reasons were pretextual, Gonzalez presented no evidence to support an inference they were a pretext *for unlawful discrimination*.  She presented no evidence of other conduct suggesting her alleged mistreatment was motivated by animus resulting from her CFRA leaves.  As discussed above, two of the three warnings occurred

---

[4] Gonzalez also cited the example of other workers who allegedly had suffered adverse employment events after taking CFRA leave.  Without more information about those employees' circumstances than is provided in the evidence submitted by Gonzalez, most of which is hearsay and speculation, we cannot infer a pattern of retaliation.  Gonzalez also contends her CFRA leave was not properly handled by Mission, but this claim was not pleaded, and she has not demonstrated any associated harm.

before she took any leave, and the final warning occurred after a leave for foot surgery. No evidence supports an inference that her leaves resulted in discriminatory retaliation.

### 2. Age Discrimination

FEHA prohibits an employer from, among other things, discriminating against a person on the basis of age in compensation, terms, conditions, or privileges of employment. (§ 12940, subd. (a).) We found no reference to Gonzalez's age in the record, but the complaint alleges she is over the age of 45 years. In her opening brief, Gonzalez claims to be 48 years old.

In her deposition, Gonzalez acknowledged that she had no reason to believe that Gomez-Benitez had criticized her job performance because of her age, and there is no evidence in the record to suggest the various events leading to her termination were influenced by age-related animus.

Gonzalez contends her claim of age discrimination is supported by the deposition testimony of a former Mission employee, Rafael Ildefonzo, who claimed Mission had retaliated against other employees. In the testimony cited by Gonzalez, Ildefonzo described retaliation against three workers, one for pregnancy leave, one for political activity, and one for whistleblowing. Gonzalez characterizes the testimony as describing discrimination against "older workers who went on disability leave," but Ildefonzo did not ascribe any of the discriminatory conduct to age nor did he even state the ages of any of the alleged victims. Accordingly, this testimony provides no evidence to support the finding of a nexus between Mission's various disciplinary acts and discrimination based on Gonzalez's age. Gonzalez attempts to create a triable issue by contending she was replaced by a young worker, but at her deposition she testified she was replaced by Cuevas, who is several years older. Gonzalez cannot create a triable issue of fact merely by contradicting her own testimony. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21, disapproved on other grounds in *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 944.)

12

3.   Disability Discrimination.

"On a disability discrimination claim, the prima facie case requires the plaintiff to show 'he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability.' " (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159-160.)

Gonzalez claims to have suffered from a stress-related disability brought on by her treatment at work.[5]   As with her claim of age-related discrimination, there is little evidence in the record connecting her treatment with discrimination on the basis of any disability.  Her reprimands began long before she claimed to suffer from stress, and she even acknowledged in her deposition that the written warnings issued prior to her termination were not motivated by disability-based discrimination.

The only evidence identified by Gonzalez is the temporal fact that her termination occurred after she returned from a stress-related leave.  There is no evidence in the record, however, to demonstrate that Mission was aware Gonzalez was disabled by stress when the decision was made to terminate her.  Mission's director of human resources testified she was unaware of the reason for Gonzalez's leave, and Gonzalez does not claim to have told anyone in authority at Mission.  When she returned to work after her leave in September 2010, she returned without restrictions on her activities, and she did not inform anyone at Mission that she was in any way disabled.  Nor did she believe Mission had any way to learn, other than from her, of her disability.  Gomez-Benitez, who was ultimately responsible for the decision to terminate Gonzalez, declared that when Gonzalez returned to work in September 2010, she did not notify Mission that she continued to be disabled, and he did not consider her so.  Because there is no evidence

_____

[5] Gonzalez is vague about the disability she claims, but the only other disability would be from her foot surgery.  Because there is no evidence in the record to suggest that this surgery had any physical effects that lingered more than a few weeks after the end of her disability leave, there is no reason to believe it would have motivated some type of unlawful discrimination.

13

that Mission was aware of Gonzalez's disability at the time of her termination, there is no reason to believe that Gonzalez was terminated because of it.

### 4. Retaliation.

Under FEHA, "[i]t is an unlawful employment practice for an employer to 'discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . .' " (*Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 209.) At trial, such a claim is subject to a three-part analysis. Initially, the employee must establish a presumption of wrongful conduct by demonstrating a prima facie case of retaliation. To establish the prima facie case, " 'a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' " (*Ibid.*)

Gonzalez's evidentiary arguments for retaliation are the same as her arguments in support of her claims of discrimination. Thus, for the same reasons we have rejected her discrimination claims, we find no substantial evidence to support a conclusion that Gonzalez's treatment at work was caused by her engaging in protected activities.

### 5. Harassment and Failure to Prevent Harassment.

"In the FEHA, the terms 'discriminate' and 'harass' appear in separate provisions and define distinct wrongs. [Citations.] . . . Subdivision (j)(1) [of section 12940] makes it unlawful . . . '[f]or an employer . . . or any other person, because of . . . physical disability, mental disability, [or] medical condition . . . to *harass* an employee . . . .' " (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 705-706, italics in original.) "[H]arassment often does not involve any official exercise of delegated power on behalf of the employer. . . . [H]arassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Id.* at p. 706.) " ' "[H]arassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives." ' " (*Id.* at p. 707.)

14

The law of harassment has been developed largely in the context of sexual harassment. "California's FEHA 'recognize[s] two theories of liability for sexual harassment claims . . . ". . . quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances . . . [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment." '. . . [¶] . . . In construing California's FEHA, [our state Supreme Court] has held that the hostile work environment form of sexual harassment is actionable only when the harassing behavior is *pervasive* or *severe*." (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1043, italics in original.)

Gonzalez bases her claim of harassment on the conduct of Gomez-Benitez, who Gonzalez says called her names, criticized her work in an unreasonable manner, ignored her pleas for help, failed to develop a plan to enhance her work performance, moved her office, and exaggerated her alleged misconduct.

The claim fails for two reasons. First, most of the behavior described by Gonzalez was undertaken within Gomez-Benitez's duties as her supervisor. Her description of harassing behavior outside of Gomez-Benitez's "exercise of delegated power on behalf of the employer" (*Roby v. McKesson Corp., supra*, 47 Cal.4th at p. 706) is simply too limited and vague to support a finding that such behavior was pervasive or severe. Second, as discussed above, Gonzalez has presented no substantial evidence to suggest Gomez-Benitez's conduct was associated with her protected statuses under FEHA.

Because we find no triable issue of fact regarding actionable harassment or discrimination, Gonzalez's claim for failure to prevent harassment and discrimination also fails. And since this cause of action was the only remaining claim pleaded against the individual defendants, the award of summary judgment in their favor is affirmed.

6. Termination Contrary to Public Policy.

Gonzalez recognizes that an affirmance of summary adjudication with respect to her discrimination claims forecloses much of her claim for wrongful termination in violation of public policy, but she argues she is entitled to plead her claim for breach of

15

her employment contract, discussed below, as a tort claim for termination in violation of public policy under *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 (*Tameny*).

In *Tameny, supra*, 27 Cal.3d 167, a former employee of the oil company alleged he had been terminated because he refused to participate in an illegal scheme to fix retail gasoline prices. (*Id.* at p. 171.) Our state Supreme Court reversed the dismissal of the plaintiff's claim for wrongful termination in violation of public policy, reasoning that although employers have broad discretion to terminate employees, "fundamental principles of public policy and adherence to the objectives underlying the state's penal statutes require the recognition of a rule barring an employer from discharging an employee who has simply complied with his legal duty and has refused to commit an illegal act." (*Id.* at p. 174.) In concluding the plaintiff's claim sounded in both contract and tort, the court noted, "California decisions . . . have long recognized that a wrongful act committed in the course of a contractual relationship may afford both tort and contractual relief, and in such circumstances the existence of the contractual relationship will not bar the injured party from pursuing redress in tort." (*Id.* at pp. 174-175.)

*Tameny* does not permit Gonzalez to convert her claim for breach of her employment contract into a tort claim. As *Tameny supra*, 27 Cal.3d 167 recognized, "[n]umerous decisions . . . confirm that ' "it [is] well established in this state that if the cause of action arises from a breach of a promise set forth in the contract, the action is ex contractu [from a contract], *but if it arises from a breach of duty growing out of the contract it is ex delicto* [from a tort]." ' " (*Id.* at p. 175, italics in original.) As the court explained, if a duty depends on express or implied promises in the contract itself, any action on the duty sounds in contract, but if the cause of action depends upon "a duty imposed by law upon all employers in order to implement the fundamental public policies embodied in the state's penal statutes," it may also be pleaded in tort. (*Id.* at p. 176.)

Gonzalez's claim for wrongful termination in violation of a contractual term requiring "cause" for her termination is based directly on the alleged terms of her contract. There is no larger public policy requiring "cause" for the dismissal of

employees. On the contrary, the Labor Code holds that employment contracts of indefinite terms are presumed to be terminable at will by either party. (*Id.*, § 2922.) Accordingly, her claim for wrongful termination under contract provides no basis for a tort claim under *Tameny supra*, 27 Cal.3d 167.[6]

       7. Breach of Contract.

Gonzalez's claim for wrongful termination in violation of her employment agreement is premised on Mission's "Human Resources Policies & Procedures Employee Manual" (manual) (boldface omitted).[7] Under the section entitled, "Separation from Employment" (boldface omitted, upper case lettering changed to initial capitalization), the manual discusses voluntary resignation, reduction in work force, and involuntary separation. Under the heading entitled "involuntary separation," (italics omitted, upper case lettering changed to lower case), the manual differentiates between probationary, temporary, and regular employees. It states that probationary employees "may be terminated for any reason" and "[t]emporary, hourly, or casual employees" may be terminated "due to a change in the Center's workload requirements and/or failure of the employee to perform in a satisfactory manner." But it also states that "Regular employees," such as Gonzalez, "may be terminated for cause." According to the manual, "cause" includes, but is not limited to, "[g]ross misconduct and dishonesty," commission of a felony or serious misdemeanor, misuse of Mission funds, conflict of interest, failure

---

[6] Gonzalez also asserts additional public policy claims under *Tameny, supra*, 27 Cal.3d 167, which she contends allow broader claims than FEHA, but she does not clearly articulate what public policy was violated by Mission other than those given statutory protection.

[7] Although Gonzalez characterizes her claim as one for breach of an "*express*" employment contract, there is no evidence she had a formal employment contract. Claims based on a violation of an employer's personnel policies are characterized as breach of an *implied* contract since the policies themselves do not constitute an express contract. (See *Foley v. Interactive Data Corp.* (1988) 47 Cal. 3d 654, 682.) We consider Gonzalez's arguments regarding the claim notwithstanding her mischaracterization because the complaint clearly alleges that the claim is based on the provisions of the employee manual, and Mission does not assert a defense based on the mischaracterization.

17

to complete work assignments in a satisfactory manner, substance abuse, fraud, excessive absences, insubordination, and other "serious infractions."

Under Labor Code section 2922, there is a "strong" presumption that the employment of a worker without a contract for a set term is terminable at will by both employer and employee. (*Guz*, *supra*, 24 Cal.4th at p. 335.) Nonetheless, "[t]his presumption may . . . be overcome by evidence that despite the absence of a specified term, the parties agreed that the employer's power to terminate would be limited in some way, e.g., by a requirement that termination be based only on 'good cause.' " (*Foley v. Interactive Data Corp., supra,* 47 Cal.3d at p. 677.) "In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' " (*Id.* at p. 680.) "[A]n allegation of breach of written 'Termination Guidelines' implying self-imposed limitations on the employer's power to discharge at will may be sufficient to state a cause of action for breach of an employment contract. . . . [T]he trier of fact can infer an agreement to limit the grounds for termination based on the employee's reasonable reliance on the company's personnel manual or policies." (*Id.* at pp. 681-682; see also *Asmus v. Pacific Bell* (2000) 23 Cal. 4th 1, 11 ["California law permits employers to implement policies that may become unilateral implied-in-fact contracts when employees accept them by continuing their employment"].) The existence of an implied contract limiting an employer's right to terminate at will is based on an examination of the totality of circumstances. (*Guz*, at p. 337.) " 'Generally, the existence of an implied-in-fact contract requiring good cause for termination is a question for the trier of fact.' " (*Stilwell v. The Salvation Army* (2008) 167 Cal.App.4th 360, 380.)

Although the parties dispute whether Mission's manual created an implied contract, the issue is immaterial because we shall assume for purposes of reviewing the summary judgment that it did. Our assumption is based on the language of the manual,

18

which states that probationary employees may be terminated for any reason and regular employees may be terminated for cause. A logical interpretation of this distinction is that Mission employees could anticipate that their employment would be terminated only for cause upon the expiration of their probationary period. The reading suggested by Mission, that regular employees "may" be terminated for cause, but "may" also be terminated for other reasons, is implausible and fails to explain why categories of employees are treated differently or why the manual describes the kinds of conduct that constitutes cause.

We therefore turn to consider what constitutes sufficient cause for termination. " 'Good cause' " is ordinarily defined as " ' " 'a fair and honest cause or reason, regulated by good faith . . .' " ' [citation], as opposed to one that is 'trivial, capricious, unrelated to business needs or goals, or pretextual . . . .' " (*Guz, supra*, 29 Cal.4th at p. 336.) But here the manual can be understood to state a more exacting definition because it refers to relatively serious misconduct. As noted above, the first example cited is not merely misconduct, but "gross misconduct and dishonesty." Additional examples are serious crimes, defalcation and fraud, unsatisfactory work performance, substance abuse, insubordination, and other "serious infractions."

Still, there is little doubt Mission could have terminated Gonzalez even under this more exacting definition when she refused her supervisor's instruction to meet in 2009, and again when she became embroiled in the argument with the physician in early 2010. This conduct, at the very least, constituted insubordination and unsatisfactory work performance. But the incidents in June and October 2010 were less egregious and arguably failed to meet this more exacting standard. In June, Gonzalez ignored her directions to refrain from supervising others when she threatened a coworker about the coworker's job performance. And in October, she used a vulgar exclamation in front of clients and at least one coworker, although the exact degree of vulgarity is a matter of

19

dispute.[8]  Although the June and October incidents were less egregious than the earlier ones, we need not decide whether they, standing alone, would constitute sufficient cause for termination under Mission's manual because they occurred when Gonzalez was under the plan.

In California, employers are permitted to unilaterally modify terms of unilateral implied contracts so long as reasonable notice is provided to the employee.  (*Asmus v. Pacific Bell, supra,* 23 Cal.4th at pp. 11, 14.)  Although Mission provided little advance notice to Gonzalez of its decision to substitute the good-cause standard of the manual with the plan, the substitution was permissible in light of its forbearance from terminating Gonzalez.[9]  As *Asmus* noted in quoting with approval an out-of-state decision, " '[w]hen the employer chooses in good faith, in pursuit of legitimate business objectives, to eliminate an employee policy as an alternative to curtailment or total shutdown, there has been forbearance by the employer.  Such forbearance constitutes a benefit to the employee in the form of an offer of continuing employment.  The employer who provides continuing employment, albeit under newly modified contract terms, also provides consideration to support the amended policy manual.' " (*Id.* at p. 14.)  Mission could have fired Gonzalez in January 2010.  Its decision not to do so provided consideration for its modification of the manual by instituting the plan.

The plan in effect at the time of Gonzalez's termination required Gonzalez to satisfy the following standards:

---

[8] In connection with her motion for reconsideration, Gonzalez submitted a declaration from a linguist who opined that "the word *chingado* does not constitute a curse word particularly when it is used as a self directed expression of frustration."  (Italics and underlining in original.)

[9] The requirement of reasonable notice in *Asmus, supra,* 23 cal.4th 1 arose in the context of a unilateral change to an employee manual in the absence of any triggering event.  (*Id.* at p. 12.)  The court concluded consideration for the change was unnecessary if the employer waited a "reasonable time" and provided "reasonable notice of the change." (*Id.* at p. 14.)  Here, Mission's forbearance provided ample consideration for the change.

1. First, and foremost, you are expected to conduct yourself in a professional demeanor, <u>at all times</u>. This means:

> You will conduct yourself in a respectful manner to all employees, managers, nurses, doctors, and patients.
> You will speak to your team members and clinic managers in a professional and respectful way.
> You will speak in a normal tone of voice, and will request a meeting to discuss any concerns you may have . . . .
> . . .
> Refusal to speak respectfully to a team member (or clinic manager), i.e.[,] going quiet[,] yelling, or inappropriate displays of anger, will not be tolerated.

2. Derogatory statements, condescending remarks, and off-color joking are examples of inappropriate behavior in the work place. You will refrain from behaving this way with your co-workers, managers, and/or doing so in front of patients."

(Underlining in original.)

These terms plainly notified Gonzalez that she needed to be especially vigilant regarding her demeanor and professional relations with her coworkers and superiors. Furthermore, she was pointedly given "a final reminder that [she] must meet the expectations of [the plan] at all times." And she was told that if she did "not meet the requirements of this plan going forward, further disciplinary action may be taken, up to and including termination of [her] employment."

The uncontradicted evidence is that Gonzalez did not conform her behavior to the plan's directives when she threatened a coworker about the coworker's job performance and when she exclaimed "chingado" within earshot of clients and a coworker. Gonzalez does not dispute these behaviors, although she contends that Gomez-Benitez was hostile, failed to consider her circumstances fairly, and used the vulgar remark as a pretext for Mission to rid itself of a difficult employee. Although she claims that other employees engaged in behavior similar to hers and were not disciplined, she presents no evidence that any of them engaged in unprofessional behavior after having been placed on a performance plan strictly prohibiting such behavior. Accordingly, even if the manual is considered to have created an implied contract, and even if the final two incidents of

21

misconduct would have been insufficient cause for termination under such a contract, the uncontroverted incidents nonetheless constituted sufficient grounds for termination under the plan.

We reject the notion that an employer who places an employee on a performance plan cannot terminate the employee for violating the plan without showing that the violation would also have constituted sufficient cause regardless of the plan. A ruling otherwise would tacitly encourage employers not to give employees who have given cause for their termination a second chance by putting them on a performance plan. We decline to adopt a rule that would send such a message.

C.     Motion for Reconsideration.

We find no abuse of discretion in the trial court's conclusion that Gonzalez presented no new facts or law sufficient to justify reconsideration of its grant of summary judgment. (Code Civ. Proc., § 1008; *Hudson v. County of Los Angeles* (2014) 232 Cal.App.4th 392, 408 [standard of review].) Gonzalez submitted three new declarations, but the trial court could readily have concluded that they did not contain new information material to the motive for her termination.

D. The Sanctions Motion.

Gonzalez challenges the trial court's award of sanctions in connection with the destruction of her journal, arguing there was insufficient notice of a request for monetary sanctions against her attorney, and the award of sanctions against her constituted an abuse of discretion. We review an award of sanctions for abuse of discretion. (*Martorana v. Marlin & Saltzman* (2009) 175 Cal.App.4th 685, 698.)

1. Sanctions Against Counsel.

As discussed above, neither the notice of motion for the second sanctions motion nor the proposed order submitted with the motion sought sanctions against Gonzalez's counsel. The only reference to sanctions against counsel was a line in the memorandum of law accompanying the motion, which was contradicted by the memorandum's conclusion seeking sanctions only against Gonzalez. Nor was the motion focused on counsel's conduct. Mission sought sanctions against Gonzalez on the basis of her

22

destruction of evidence, without demonstrating counsel's connection to any spoliation. On this record, we agree with Gonzalez that the court erred in awarding sanctions against counsel.

The notice of motion is critical in providing notice to an opposing party of the relief sought by a motion and the grounds for that relief. (E.g., *Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1125.) Accordingly, principles of due process preclude an award of sanctions against an opposing attorney when the notice of motion seeks sanctions only against the opposing party. (*Blumenthal v. Superior Court* (1980) 103 Cal.App.3d 317, 318-320.) Because Mission did not seek sanctions against counsel in its notice of motion, we conclude that the trial court erred in awarding them.

Defendants argue they provided notice through the one-line reference in their memorandum of law, but there is no reason to believe this would have placed counsel on notice that sanctions were sought against him, especially since the reference contradicts the other documents filed in connection with the motion, including the concluding sentence of the very same memorandum of law. The portion of the sanctions order imposing sanctions on counsel must be annulled.

2. Sanctions Against Gonzalez.

Gonzalez also contends the trial court abused its discretion in awarding monetary sanctions and a jury instruction on spoliation of evidence as a result of the destruction of her journal.[10]

"Spoliation occurs when evidence is destroyed or significantly altered or when there is a failure to preserve property for another's use as evidence in current or future litigation." (*Strong v. State of California* (2011) 201 Cal.App.4th 1439, 1458.) In precluding a tort cause of action for spoliation, the Supreme Court emphasized the importance of the available nontort remedies, the "[c]hief" of which "is the evidentiary inference that evidence which one party has destroyed or rendered unavailable was

---

[10] We do not separately address the appropriateness of the jury-instruction sanction because it has been mooted by our affirmance of the trial court's grant of summary judgment.

23

unfavorable to that party . . . [as] set forth in Evidence Code section 413 and in the standard civil jury instructions." (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 11.)

We find no abuse of discretion in the trial court's award of sanctions. There was substantial evidence that Gonzalez destroyed, or permitted to be destroyed, her personal record of the events at issue, recorded contemporaneously with those events. This evidence was potentially of critical importance. Furthermore, the destruction occurred at a time when Gonzalez decided to file suit.

Gonzalez contends the journal contained material protected by the patient-psychotherapist privilege or the constitutional right to privacy. But whether the journal was confidential in whole or in part was an issue for the trial court to resolve. Gonzalez was not entitled, in effect, to avail herself of self-help in asserting those privileges. On the contrary, she had a duty to preserve the evidence while asserting whatever defenses she might have to its production during the civil discovery process.

Gonzalez also contends she was unaware she should preserve the journal. At the time of its destruction, however, she had already filed an administrative charge of discrimination, decided to file suit, and then asked to have her administration charge dismissed as a prelude to suit. Regardless whether she was aware of her legal duty to preserve evidence, the trial court was entitled to conclude that she was sophisticated enough to recognize the importance of the journal in the context of litigation and the bearing it might have on her claims.

DISPOSITION

The trial court's grant of summary judgment is affirmed. The trial court's award of monetary sanctions against Gonzalez is affirmed, but its award of monetary sanctions against Gonzalez's attorney is annulled.

24

                                                 _____

                                                 Humes, P. J.

We concur:

_____

Margulies, J.

_____

Banke, J.

*Gonzalez v. Mission Neighborhood Health Center* (A140075)

25